UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X
GARFIELD WILLIAMS,

        Plaintiff,

v.

WESTCHESTER MEDICAL CENTER
HEALTH NETWORK, MARCELA STEGER,
JASON YOAKUM, & KENNETH OSARIO,

        Defendants.
_____X

<u>COMPLAINT</u>

**JURY TRIAL DEMANDED**

21-cv-3746

Plaintiff Garfield Williams alleges upon his knowledge and credible evidence as follows:

1.     In this case, race stereotypes damaged a man's good name and cost him his job. Garfield Williams is confident and easy-going, calm with an exceptional personal manner. He is also Black, tall with a solid build. One could reasonably call him "big."

2.     When someone asks him to spell his first name, Garfield Williams uniformly responds: "Garfield, like the cat." It's an easy pneumonic for the speller and the speaker, and every time Garfield Williams articulates this instruction, he always gets a chuckle and gives one back. Garfield, the Plaintiff, emits a natural, sophisticated charm. One might describe Garfield Williams as a "Cat" in the language of Jazz. But suffice to say that Garfield (the Plaintiff) is no Garfield the Cat if you know what I mean.

3.     At one time, Garfield's mother gave him (what I have learned is known as) "The Talk." His mother's advice remains in his mind; sometimes, he hears her voice whispering in dealing with the police, for example. Life could have been worse for a man like Garfield, to be sure. But he spent most of his life in the Bronx. When Plaintiff took a job with Westchester Medical Center Health Network (WMC) in Hawthorne, New York, he could not fully navigate the new realm, not

1

with the ease of others. Nor could he avoid discrimination and retaliation. Garfield knew what was happening. He knew it was wrong and reported it.  But he had no success against the targeted, racially unfair treatment brought upon him, fueled by savage office politics.

4.      The racial favoritism was so bad that one defendant, Kenneth Osario, simply relied on what another had said. He didn't even question Garfield or look at the surveillance tape – the tape by now having been conveniently lost. (Upon information and belief.)

5.      Like many Black American men, Garfield is often stereotyped. These defendants also engaged in stereotyping – the worst evil among several. Garfield lost his job on the pretextual basis that he was "belligerent" – or other similar, racially tainted adjectives applied to a big Black man. Garfield would not be a pushover, and he complained about the treatment. After he was in an accident (and after his termination), WMC refused to verify his employment with a No-Fault insurance carrier. The verification would have provided Garfield with lost wages and allowed him to pay medical bills owing to the accident. WMC knew that withholding the information from the carrier would make Garfield suffer even more after his discriminatory and retaliatory termination.

6.      Garfield Williams is a trained Patient Care Technician (PCT). He assists nurses (also doctors) and prepares for operations. Williams gained his experience during seven years at the Young Adult Institute (YAI) in the Bronx. At YAI, he also earned several certifications in providing medical care to special needs children and adults.

7.      Garfield adored YAI, and the training there allowed him to climb up the ladder and earn more money at a place like WMC. There, he learned even more, and he followed procedure earnestly. He worked in an Operating Room at WMC's Hawthorne Facility. Garfield was mastering his career and carried out safety rules with the punctilio of an honor the most sensitive. He knew his role protected the public. At least once, defendant Marcela Steger derided Garfield

as a "Janitor," a word that by now is a caste-pejorative. She treated him likewise. But Garfield knew he was not just as a broom-sweeper. He tried to stop Steger's ugly words, often combined with denunciation, threats, and profanity. But no one at WMC would hear him. Steger was "protected" no matter what, whereas Garfield was just the new Black guy who happened to get into a car accident to boot.

8.      Garfield met WMC's expectations based, at least, on one formal evaluation.

9.      Garfield Williams has vast, natural charm; he is deft at making friends, including in the workplace. He had no interest in amassing political power, and the individual defendants were likely afraid of his tranquil people skills. Indeed, at WMC, he tried to avoid office politics, though the individual defendants steered him into them. Nurse Steger – a Maven of Office Politics with vast seniority – tried to goad Garfield into getting angry on several occasions. Garfield doesn't anger easily. He also knew that if he showed anger, defendants would peg him as the prototypical "Angry Black Man." He eventually was. Steger's deeds in concert with the individual defendants would petrify anyone with a sensitivity to racial stereotypes or anyone who knows how they reinforce racial inequality.

10.     Indeed, the individual defendants used racial stereotypes to buttress a dubious accusation of insubordination that defendant Jason Yoakum had made. Yoakum has no apparent role at WMC, supervisory or otherwise. One could say he is a Jack of all Trades – a helpful thing for any institution. Nevertheless, Yoakum revels in misusing the power he has amassed; he abuses others. He brags in the OR when he believes he succeeded in getting someone fired. But Yoakum, who has the title of "Director," has no defined role at WCM. He is the Director of perhaps only himself and how to protect his job.

11.     Yoakum thought that he could dissuade Plaintiff from taking intermittent or short-term leave under the Family and Medical Act (FMLA). Garfield was the victim of a significant car accident that caused him extreme pain. Garfield brought in doctor's notes, but Yoakum concluded that even asking for leave was "insubordinate."

12.     Therefore, Yoakum lacks knowledge about civil rights; therefore, he couldn't know that the attempt to exercise FMLA rights may never, by definition and by law, be insubordination. Garfield insisted on speaking to Human Resources to plan his FMLA leave. It was impossible to negotiate a solution with Yoakum that paid heed to any of Plaintiff's rights.

13.     There are also pitfalls to avoid and procedures to follow in following the FMLA. Because Yoakum interfered with Garfield's taking leave, rejecting the latter's suggestion that he should have a private meeting with Human Resources – the latter never had a chance to evaluate his right to leave, nor could Garfield explain his serious health condition. So, he never got any FMLA leave, just criticism for taking some time off. Yoakum had no role in granting leave or supervising it. However, because of Yoakum's perceived political power – which was actual power in the eyes of some  – he got away with intimidation and interference. Garfield's request to speak to someone other than Yoakum interfered with Plaintiff's FMLA rights because he could never record it. Meanwhile, Plaintiff's need for time off morphed into insubordination. Things then continued to get ugly.

14.     Yoakum, Steger, and Osario knew that Yoakum had no leg on which to stand. So, whether on her own or in concert with others, Steger and defendant Kenneth Osario (a managing nurse in the OR) tried to paint Garfield as the wrathful Black Man: belligerent, aggressive, argumentative, threatening.

4

15.     Garfield is genetically tall with a masculine build, so there you have it. Without getting into gradations, Garfield is undeniably big and undeniably Black. But to suggest that the way he looks bears on who he is (as a person) is a pure racial stereotype.

16.     Yes, he was the biggest (and only) Black man in his OR. He got along with his coworkers with simplicity, and perhaps that was threatening to others. He could not avoid Steger's bullying, and he complained about it. She knows how to assert her physical self as if to suggest that no feminine white woman could be in a position of bullying a Black man.

17.     But race can be power, as our country's history shows.

18.     Steger said words to the effect of "Oh, big man. Come outside. Are you afraid of little old me?" She also called him "Sonny," a quiet racial slur akin to "boy" – a word she used as preceded by "little." She threw shade, trying to prod Garfield into anger; perhaps she expected it. Her efforts failed, but she later lied and pronounced victory. Garfield was "intimidating," "threatening," she probably feigned "fear for her safety." Marcela insulted Garfield's intelligence, thinking she could outwit, and her sense of entitlement would carry the day. Though she failed, her privilege won in the end, as she simply declared victory. She, with others, accused Plaintiff as the prototypical big Black man, and he lost his job.

19.     The reality is that Garfield did not take her bait. He is not a person easy to anger, plus he's savvy. Marcela and the other individual defendants made it seem as if Garfield had done something and the evidence for that was nothing other than his being big and Black. Some think that would speak for itself.

20.     WMC then fired Garfield for being belligerent (or whatever choice epithet) Defendant Kenneth Osorio wrote the termination letter as well as an accusatory email. Osorio is an RN with management authority in this OR, but Osorio saw nothing. He backed the other discriminators

reflexively. He did not even talk to Plaintiff. Did he believe Garfield was dangerous? Upon information and belief, he did not even look at a surveillance tape. (By now, the video will have been deleted.) One might call Osorio the "Cat's Paw" in this awful fable, but Osorio was no mere conduit. He was the conductor.

21.    Why did Marcella do this to Plaintiff? Aside from her problem with Black men and wanting to protect her political power, she also wanted to support Yoakum – a man with no clear role, supervisory or otherwise. Yoakum asserts his perception of authority, and others back him up. He brags about getting people fired. He succeeded again with Garfield simply because Garfield wanted to speak to Human Resources – not Yoakum – about his confidential FMLA query.

22.    Yoakum impeded Garfield in getting this leave approved and accused him of insubordination for not insisting on a confidential discussion with HR. Exercising a legally protected civil right cannot, by law, be an act of disobedience. When the individual defendants finally succeeded in convincing a person in power – Osario, who reflexively sided with Marcela and Yoakum – threw him out of the building.

23.    To knock him while he was down – all too common in the exercise of white power – defendants saw fit to erect a "WANTED Poster" on the front door of the Medical Center to warn others of the angry black man. The poster, which is far from WMHCN's policy, is attached as an Exhibit. With bold capped **WARNINGS**, the sign makes trivial exceptions for medical treatment with some form of supervision, but why would those things make a difference if Plaintiff were dangerous?

24.    If someone at WMC expressed that Plaintiff was aggressive, why would he consider showing up where a WANTED Poster awaited him at the front door? He would not. WMC knew this. The "WANTED Poster," yet another expression of racial stereotype, was erected to reinforce

the earlier racial stereotypes that defendants visited upon Mr. Williams.

25.   The Wanted Poster and what preceded it is employment discrimination grounded in a racist trope that permeates society. As Natalie Baptiste wrote in <u>Mother Jones</u>, "It's not the first time this trope will be deployed against Black people, and it certainly won't be the last." "The Myth of the Supernegro Comes to Derek Chauvin's Defense," <u>Mother Jones</u>, April 21, 2021. Baptiste elaborates that the "terrifyingly powerful Black man"

> has been a reliable fixture in American mythology for hundreds of years. . . . After slavery officially ended, writers took great pains to describe Black men as near monsters, capable of untold horrors. "The [B]lack brute is lurking in the dark, a monstrous beast, crazed with lust[.] . . . His ferocity is almost demoniacal."

*Id.*, available at https://tinyurl.com/3ek7eksr.

26.   By contrast and ever so timely, Vice President Kamala Harris that very week spoke with touching delivery and handsome words when she spoke to the Nation:

> America has a long history of systemic racism. Black Americans and Black men in particular have been treated throughout the course of our history as less than human.
>
> Black men are fathers and brothers and sons and uncles and grandfathers and friends and neighbors.
>
> Their lives must be valued in our education system, in our health care system, in our housing system, in our economic system, in our criminal justice system, in our Nation.
>
> Full stop.

<u>New York Times</u>, April 21, 2021, quoting Vice President Kamala Harris. (https://tinyurl.com/u8jjpsuw.)

<u>Parties & Jurisdiction</u>

27.   Plaintiff Garfield Williams resides in Bronx, NY.

28.   Defendant Westchester Medical Center Health Network has offices in the State of New York, including 19 Bradhurst Avenue, Suite 3080N, Hawthorne, NY 10532.

29.   Defendant Marcella Steger is a Registered Nurse and Defendant Westchester Medical Center Health Network employee. Her residence is unknown. Plaintiff sues her in her individual capacity and as an agent of her employer. She is originally from *Perú* and has a white complexion.

30.     Defendant Jason Yoakum is an employee of Defendant Westchester Medical Center Health Network. His residence is unknown. Plaintiff sues him in his individual capacity and as an agent of his employer. He has a white complexion.

31.     Defendant Kenneth Osario is an employee of Defendant Westchester Medical Center Health Network. His residence is unknown. Plaintiff sues him in his individual capacity and that of her employer, should that make a difference. He is originally from Puerto Rico and has a white complexion.

32.     There is federal question jurisdiction under the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq., and Title VII of the Civil Rights Act of 1964 as amended.

33.     Venue is proper insofar as that one or more defendants reside in this judicial district.

        The Deployment of Racial Stereotypes. The Minds from Whence They Came.

34.     Long before her death. Nina Simone sang about the racism she witnessed that was so obvious to her:

> Can't You See It?
> Can't You Feel It?
> It's All in the Air.
> I Can't Stand the Pressure Much Longer!
> Somebody Say a Prayer[1]

35.     What happened to Miss Simone – an artistic genius rejected from a Philadelphia conservatory because she was Black – might not happen today. At least not in the same way. Racism, however, may still be found in the highlights, shadows, whispers, and careless emails of the Wide Sargasso Spectrum. Racism works more softly today. Some might disagree with this characterization, but no one would disagree that racism has pernicious societal costs.

36.     Garfield understood discrimination; he grew up and worked in the Bronx. When life

---

[1] Nina Simone, "Live at Carnegie Hall" 1964.

promoted him to WMC in nearby Westchester, he found himself confronted by a strong power with which he was unfamiliar. He had never had low self-esteem because of his race; it was, therefore, not within his disposition to kowtow. Garfield, thus, complained when Steger harassed him, and she met his challenge by harassing him worse. Her harassment was loud, and it often happened, not just by the throwing of shade, but with abundant profanity and coded language: Janitor, Boy, Big Man, Sonny.

37.     Garfield still had to work with Marcela, who remained abusive, even after the complaint of her abusiveness. This stance was antithetical to the idea of a calm and safe Operating Room.

38.     In his role, Garfield got the tables ready for surgery. When he completed this task, there were certain things he needed to do during surgery. Then he cleaned up. He knew the standard (and some more esoteric) safety rules and followed them with satisfaction.[2]

39.     A sensitive avoidance of infection and attention to detail were requirements that a PCT had to have. Germane to this case, a PCT is part of the team that protects patients from leaving the hospital with foreign objects in their inner cavities. The gauzes and sponges used in surgery: one may not toss them like a used paper towel. Medical paraphernalia (foreign objects as otherwise known) left inside a person can cause infection, toxic shock.

40.     Indeed, leaving a surgical sponge inside a human is probably medical malpractice per se. Recutting and resewing is a nasty business that can cause worse infection.

41.     In addition to accounting for each sponge, the procedures required medical waste to be kept at a discrete location. The surgical team accounted for sponges before final disposal. No disposal could occur until the highest responsible actor for a particular surgery concluded that every sponge had been recorded and reported as removed.

---

[2] Plaintiff's employment at WMC was mostly pre-COVID. He was fired at precisely the time that any medical center needed more medical staff.

42.     On or about October 14, 2019, Plaintiff cleaned up OR # 102 after surgery; he worked with two other PCT's, Danny and Walter.

43.     Mr. Williams cleaned up and collecting the trash, including the used dressings on the operating table, drapes, linens, and bloody sponges. He put the medical waste into specially marked trash containers known as red-blood bags.

44.     The bags were tied up and placed in a corner inside room 102. Eventually, they would be removed by other staff. Indeed, one nurse, not a defendant, told Plaintiff not to throw out these bags as she had just completed surgery and needed to account for every sponge.

45.     But defendant Steger, when she arrived in the OR, wanted to cause a stir. She inquired about the bloody bag. Plaintiff told her that, as instructed, he cleaned up room 102 and put all hazardous items into designated bags and keep them there until she oversaw the recount of each sponge.

46.     Steger then, with no reason other than to harass and assert her authority, demanded that Plaintiff go through the trash, find and remove *her* sponges from the bags. She demeaned him by analogizing him to a janitor. Her demand could have resulted in a miscount; it would have been impossible to distinguish *her* bloody sponges from anyone else's.

47.     Marcela then made threats and used profanity, even as Garfield tried to satisfy her unreasonable demands, supplying an explanation about the other nurse's instruction as required. But Marcela didn't reason – not that she couldn't. She just didn't.

48.     Plaintiff went to the front desk where a Patient-Center Care Nurse sits. He spoke to one "Vinny Acevedo" who was on duty at the time. He tried to explain the conflicting demands and unprofessional threats that Steger had vented.

49.     During this conversation, Steger approached and stopped the conversation, cursing and

10

pointing in Plaintiff's face, threatening to get him fired, and demanding that Plaintiff do something in conflict with the directions of the earlier nurse.

50.     Plaintiff could not ethically do so; he was instructed differently by the other nurse who had been part of the surgery. Garfield attempted to walk away, but Steger continued her barrage of threats, hostility, and profanity in front of several employees and staff. She was not Plaintiff's supervisor, then or ever. She just hated Plaintiff and wanted to goad Plaintiff into anger.

51.     Plaintiff spoke to Yoakum and about the threats, hostility, profanity, and misconduct engineered by a deranged mind who would have to get her way. But Garfield had little idea that the two were already working in cahoots.

52.     Marcela commented that Plaintiff's being is a male disqualified him from feeling intimidated or afraid; after all, she is a diminutive woman, in the range of 100-125 pounds. This disparity in size Marcela believed spoke for itself, as did others.

53.     Because of the October 14, 2019 incident, two days later, Plaintiff filed a complaint with the Human Resources Department of defendant WMC.

54.     Additionally, despite Plaintiff's best efforts to keep the incident under wraps, rumors about spread throughout the workplace. Coworkers constantly approached Garfield and asked him what had happened.

55.     These rumors, Plaintiff sensed, caused the staff to distance themselves from Plaintiff. At a minimum, the entire debacle caused him to lose confidence in himself and his work performance. He became dysthymic.

56.     Despite Plaintiff's pending complaint against Steger, WMC knowingly continued to schedule Plaintiff to work alongside her.

57.     On October 23, 2019, just two weeks later, Plaintiff was scheduled to work with Marcela

in OR 102.

58.     Plaintiff sent an email to Human Resources about this, again advising WMC that he found it impossible to work with Steger because of her treatment of him and, not incidentally, given the open complaint about October 14. Plaintiff made it plain: the incident harmed his work environment and confidence. But the incident and its aftermath were never addressed by management or Human Resources – as far as we know.

59.     Plaintiff never received a response from anyone at WMC. It never addressed Garfield's concerns but didn't accept the notion that a slight woman could harass a big Black man.

60.     After weeks of no response from WMC, Garfield visited the Human Resources department. But Human Resources Officers (or their designees) turned him away.

61.     Plaintiff even inquired with other managers if they had heard anything from HR regarding his complaint. Someone told him, "Probably nothing would happen because it was a female world."

62.     Plaintiff then filed an EEOC claim against WMC.

63.     On December 15, 2019, bad luck caused by another driver resulted in a motor vehicle accident on the Bronx River Parkway. Plaintiff suffered several injuries.

64.     Plaintiff was also the victim of false arrest concerning the above accident and was transported to Jacobi Medical Center by members of the NYPD for medical evaluation.[3] He suffered severe pain. He had to have diagnostic imaging to determine a proper diagnosis.

65.     Williams noticed an increase in the pain's severity; he would have to miss some work.

66.     He made every attempt to be at work but had no choice to take from his bank of sick days part of his compensation due to pain and other bodily dissatisfactions deriving from *l'incidente*

---

[3] This arrest is documented (arrest number B19649648-N) but was never docketed in criminal court because plaintiff did nothing wrong. Separately, there is a wrongful arrest case pending in the Foley Square, 20-CV-5995 (LS).

*d'auto*.

67.     Garfield always provided a doctor's note or similar to justify these sick days. Though he tried, even though he did not invoke the FMLA, Garfield suffered from a severe health condition after a severe auto accident. He was entitled to time off, and he also had the right to ask for it.

68.     WMC retaliated, deviously marking days on Plaintiff's schedule as "unpaid leave," even though he had sick time with a valid medical excuse.

69.     So quickly after insisting on his civil rights, the retaliation began. WMC didn't bother to notice how apparent was the temporary proximity.

70.     Garfield tried to return to work, but lingering physical issues delayed the effort. He decided to apply for short-term disability until he could recover.

71.     But when WMC learned of this plan, it made false accusations about him to other staff, alleging that Plaintiff had made "threats." This awful, racist reaction not only stung at his value as a person but, again, damaged his reputation at WMC.

72.     WMC then announced that it would terminate Garfield because of unscheduled absences. These absences, however, were documented sick days following the accident, so WMC conveniently bootstrapped them into Garfield's imaginary anger in response to the race-tainted taunts.

73.     Then someone told him about the Wanted Poster. He decided to sue for redress.[4]

FIRST CAUSE OF ACTION
RACE DISCRIMINATION
42 USC § 1981

74.     Plaintiff repeats and realleges each previous paragraph.

---

[4] The following causes of action are brought against each defendant as the facts of this pleading will allow, pending reasonable discovery. By law, this will except the Title VII claims and the claim sounding in contract, which plaintiff brings against WCM alone.

75.     Plaintiff was not afforded the same benefits and protections in the workplace as accorded to non-black employees.

76.     But for Racism, Plaintiff would not have lost his job. But for racism, Plaintiff would not have been held up to discriminatory ridicule, including but hardly limited to the WANTED poster.

77.     As a result of the preceding, Plaintiff has been damaged

SECOND CAUSE OF ACTION
RACE DISCRIMINATION
TITLE VII

78.     Plaintiff repeats and realleges each previous paragraph.

79.     Plaintiff filed a handwritten discrimination charge with the EEOC. An EEOC worker checked only the ADA and Retaliation boxes. An attorney friend assisted Garfield followed up with more information. Then he just got a right to sue letter. He tried to reopen the matter without success.

80.     Nevertheless, the entire communique sounds in sexism and racism. Plaintiff does not believe it would be prudent to bring an ADA claim nor one under the Rehabilitation Act. The whole experience demonstrates an overworked EEOC in a time of the pandemic.

81.     As a result of the preceding, Plaintiff has been damaged.

THIRD CAUSE OF ACTION
RACE DISCRIMINATION
NEW YORK STATE HUMAN RIGHTS LAW

82.     Plaintiff repeats and realleges each previous paragraph.

83.     Race discrimination was a contributing factor to Plaintiff's termination

84.     As a result of the preceding, Plaintiff has been damaged

FOURTH CAUSE OF ACTION
RETALIATION
TITLE VII

85.     Plaintiff repeats and realleges each previous paragraph.

86.     Plaintiff filed a handwritten discrimination charge with the EEOC. He adequately alleged

retaliation sounding in the handwritten charge described above.

87.     Without getting into the issue of any "adverse action" – even though his termination was

a retaliatory act – let us remember that the Supreme Court has denied retaliation under Title VII

as that which would deter a reasonable employee from making a charge of discrimination.

88.     Garfield received a right to sue letter within less than 90 days hence.

89.     As a result of the preceding, Plaintiff has been damaged

FIFTH CAUSE OF ACTION
RETALIATION
NEW YORK STATE HUMAN RIGHTS LAW

90.     Plaintiff repeats and realleges each previous paragraph.

91.     Race discrimination was a contributing factor to Plaintiff's termination.

92.     It also created a racially hostile work environment.

93.     As a result of the preceding, Plaintiff has been damaged

SIXTH CAUSE OF ACTION
FMLA INTERFERENCE

94.     Plaintiff repeats and realleges each previous paragraph.

95.     Plaintiff was a qualified employee under the FMLA in that the WMC has more than 500

employees, and Plaintiff worked at WMC for at least a year.

96.     Actors at WMC interfered with his attempt to take FMLA to leave and even ignored –

perhaps discarded – his explanatory doctors' notes.

97.     Severe pain should qualify as a serious health condition under the FMLA. If it is not, Mr.

Williams had a good-faith basis to believe so and apply for FMLA.

98.    Yoakum, acting on his behalf and WMC, interfered with Plaintiff's right to apply to get those rights.

99.    Instead, Plaintiff's excused absences, for which he had doctors' notes, were converted into unexcused absences, the medical documentation perhaps conveniently lost. (Plaintiff has copies.)

100.   This Interference morphed with other discriminatory actions and tensions in the workplace and damaged Plaintiff.

SEVENTH CAUSE OF ACTION
SEX DISCRIMINATION
TITLE VII

101.   Plaintiff repeats and realleges each previous paragraph.

102.   Based on WMC's inaction, Plaintiff's complaint against Marcela Steger was never investigated nor given a little credit because Plaintiff is male, and Steger is female. Therefore, it would be impossible to credit his report against a female coworker.

103.   One of Plaintiff's supervisors told Plaintiff that nothing would happen because "it is a female world." (This statement, applied universally, might be an exaggeration, though not in this situation.)

EIGHTH CAUSE OF ACTION
VIOLATION OF NEW YORK SICK LEAVE LAW
NEW YORK LABOR LAW 196-B, 198

104.   Plaintiff repeats and realleges each previous paragraph.

105.   Although the New York Sick Leave law changed as of January 1, 2021, WMC violated the earlier, less-protective statute provisions.

106.   WMC is an employer with 100 or more employees in any calendar year.

107.   As such, each employee must be provided with up to fifty-six hours of paid sick leave

each calendar year.

108.    Employers are forbidden to interfering with this provision, but WMC willfully marked excused absences as unexcused and would not give sick time.

As a result of the preceding, Plaintiff has been damaged and is entitled to the remedies outlined in Labor Law § 198, including but not limited to liquidated damages, civil penalties, and attorneys' fees.

NINTH CAUSE OF ACTION
VIOLATION OF NEW YORK SICK LEAVE LAW
NEW YORK LABOR LAW 196-B & 198

109.    Plaintiff repeats and realleges each previous paragraph.

110.    Although the New York Sick Leave law changed as of January 1, 2021, WMC violated the earlier, less-protective statutory provisions.

111.    WMC is an employer with 100 or more employees in any calendar year.

112.    As such, each employee must be provided with up to fifty-six hours of paid sick leave each calendar year.

113.    Employers are forbidden to interfering with this provision, but WMC willfully marked excused absences as unexcused and would not give sick time.

114.    As a result of the preceding, Plaintiff has been damaged and is entitled to the remedies outlined in Labor Law § 198, including but not limited to liquidated damages, civil penalties, and attorneys' fees.

TENTH CAUSE OF ACTION
VIOLATION OF LABOR LAW § 741
RETALIATION FOR ENFORCING MEDICAL SAFETY RULES

115.    Plaintiff repeats and realleges each previous paragraph.

116.    Under Labor Law § 741, a healthcare worker is entitled to register a good faith belief that a health-related safety rule is not being followed. He is entitled to report that to a supervisor.

117.   Plaintiff reported the safety violations that could have resulted from Steger's demands that conflicted with those of another nurse who had given him different directions.

118.   Plaintiff suffered retaliation as a result of this, and it contributed to his termination.

119.   As a result of the preceding, Plaintiff has been damaged and is entitled to the remedies outlined in Labor Law § 740, including but not limited to liquidated damages, civil penalties, and attorneys' fees.

TENTH CAUSE OF ACTION
SEX DISCRIMINATION
NEW YORK STATE HUMAN RIGHTS LAW

120.   Plaintiff repeats and realleges each previous paragraph.

121.   WMC failed to afford Garfield Williams, a man, the right to be heard on a complaint of workplace harassment by a woman – solely because she is a woman, whereas he is a man.

122.   These actions and omissions violated the New York prohibition against sex discrimination; it contributed to his termination.

123.   As a result of the preceding, Plaintiff has been damaged.

ELEVENTH CAUSE OF ACTION
SEX DISCRIMINATION
TITLE VII

124.   Plaintiff repeats and realleges each previous paragraph.

125.   Though inelegantly pled, Plaintiff's EEOC charge sounded, in part, in sex discrimination.

126.   As a result of the preceding, WMC violated the protections from sex discrimination under Title VII, and Plaintiff has been damaged.

TWELFTH CAUSE OF ACTION
BREACH OF CONTRACT *or*
INTERFERENCE WITH CONTRACT *or*
BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

127.   Plaintiff repeats and realleges each previous paragraph.

128.   Plaintiff attempted to file a No-Fault claim for loss of wages through Progressive

Advanced Insurance Company.

129.   Progressive could not grant Plaintiff's request for benefits because it needed income verification from WMC.

130.   Despite multiple attempts, WMC was vindictive in its refusal to verify Plaintiff's wages to get the benefits he needed.

131.   New York has a No-Fault Insurance law enacted as a matter of public policy so that not every fender bender ends up in court.

132.   The law presumes cooperation among stakeholders, including those who must provide information to sustain the award of No-Fault benefits.

133.   Here, Plaintiff had at least a nominal contract with WMC. Part of that contract requires verification of salary for an insurance claim.

134.   Society expects employers and certain institutions to breeze through matters of this nature and send along with the paperwork. Such cooperation is essential not only to individuals who need benefits but to the smooth flow of commerce.

135.   In addition to retaliating against Garfield, WMC breached its duty to society.

136.   At a minimum, if not a classic contract claim, it was intentional inference with Plaintiff's contract with Progressive.

137.   It was also a breach of the covenant of good faith and fair dealing, which remained in the residue of the former employer-employee relationship.

138.   As such, the defendants caused Plaintiff to suffer substantial damages.

139.   Though courts rarely sustain punitive damages for a breach of contract, WMC's bad faith in its cold, retaliatory actions against Garfield Williams justifies punitive damages in this case.

CONDITIONS PRECEDENT

140.    Plaintiff filed a charge of discrimination and received a right-to-sue letter within less than 90 days of this filing.

141.    As to any pendant causes of action requiring service of a Notice of Claim, that occurred within the time allowed under Governor Cuomo's Executive Order tolling statutes of limitation and more than 30 days have elapsed without adjustment. Plaintiff sat for a comprehensive 50-h hearing on or about April 15, 2021

**WHEREFORE,** the Plaintiff requests a judgment in Plaintiff's favor awarding:

A.  Reinstatement to a suitable position at WMC;

B.  Compensatory damages to be determined by the trier of fact;

C.  Back-pay (and, if not reinstatement, then front pay to be determined by the trier of fact);

D.  Punitive damages to be determined on such causes of action that allow such, to be determined by the trier of fact;

E.  Liquidated damages under Labor Law § 741, the FMLA, and any law pleaded that allows them; and

F.  Such other and further relief that the court may deem just and proper.

**Dated:** New York, New York
             April 26, 2021


/s/ Greg S. Antollino
Gregory Antollino
Antollino PLLC
127 West 30th Street 9th Fl
New York, NY 10001
(212) 334-7397
gregory@antollino.com

Exhibit: The WANTED Poster





ARFIELD WLLIAMS **HAS MADE THREATS TO** TAFF AND IS **NOT PERMITTED ACCESS** TO WMC/APS EMPLOYEES OR WMC/APS EMPLOYEE AREAS

ASIDE FROM MEDICAL TREATMENT REASONS OR AUTHORIZED BUSINESS TRANSACTIONS CONFIRMED WITH WMC/APS STAFF, THIS PERSON IS NOT PERMITTED ACCESS AT WMC/APS LOCATIONS.  IF SEEN, IMMEDIATELY CONTACT SECURITY AT (914) 493-8535

<u>SECURITY NOTICE</u>

Pg 1 of 1

