UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GARFIELD WILLIAMS,

Plaintiff,

v.

WESTCHESTER MEDICAL CENTER
HEALTH NETWORK *et al.*,

Defendant.

No. 21-CV-3746 (KMK)

OPINION & ORDER

Appearances:

Gregory Antollino, Esq.
New York, NY
*Counsel for Plaintiff*

Daniel David Schudroff, Esq.
Leo Ernst, Esq.
Jackson Lewis P.C.
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Garfield Williams ("Plaintiff") brings this lawsuit, pursuant to 42 U.S.C. § 1981 ("§

1981"), 42 U.S.C. § 2000e (Title VII of the Civil Rights Act or "Title VII"), 29 U.S.C. §§ 2601

*et seq.* (Family and Medical Leave Act or "FMLA"), New York State Human Rights Law

("NYSHRL"), and N.Y. Lab. Law §§ 196-B, 198, 741, against Westchester County Health Care

Corporation ("WCHCC"), Marcela Steger ("Steger"), Jason Yoakum ("Yoakum"), and Kenneth

Osorio ("Osorio"; with Steger and Yoakum, "Individual Defendants"; collectively,

"Defendants"), alleging discrimination and retaliation on the basis of race interference in

violation of § 1981, Title VII, and various provisions of New York state law as well as

interference with his leave under the FMLA.  (*See generally* Am. Compl. ("AC") (Dkt. No. 24).)[1, 2]  Before the Court is Defendants' Motion To Dismiss the Amended Complaint in its entirety (the "Motion").  (*See* Not. of Mot. (Dkt. No. 31).)  For the following reasons, Defendants' Motion is granted.

## I.  Background

### A.  Factual Background

Unless otherwise stated, the following facts are drawn from Plaintiff's Amended Complaint and are assumed true for the purpose of resolving the instant Motion.  *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

Plaintiff is a Patient Care Technician ("PCT").  (AC ¶ 6.)  Plaintiff trained for over seven years at the Young Adult Institute in the Bronx and has also "earned several certifications in providing medical care to special needs children and adults."  (*Id.*)  In his role as a PCT, Plaintiff assists nurses and doctors and "prepares for operations."  (*Id.*)  One of the jobs of a PCT is to ensure all sponges and other "foreign objects" are accounted for such that patients do not leave "the hospital with foreign objects in their inner cavities."  (*Id.* ¶ 39.)

At the time of the events giving rise to this Action, Plaintiff was employed by WCHCC as a PCT and worked in an operating room in its Hawthorne Facility.  (*Id.* ¶ 7.)

---

[1] In his Complaint, Plaintiff inadvertently refers to Osorio as "Osario."  (*See* Defs.' Mem. in Supp. of Mot. To Dismiss ("Defs.' Mem.") 1 n.1 (Dkt. No. 33).)  In light of Defendants' correction, the Court refers to this individual as "Osorio."

[2] In his Complaint, Plaintiff inadvertently calls WCHCC by its trade name, Westchester Medical Center Health Network.  (*See generally* AC; *see also* Defs.' Mem. 1 (highlighting this inadvertent error).)  Accordingly, the Court refers to this Defendant as WCHCC.

Steger is a Registered Nurse for WCHCC.  (*Id.* ¶ 29.)  Yoakum is employed by WCHCC and enjoys the title of "Director," though Plaintiff alleges that Yoakum "has no defined role at [WCHCC]."[3]  (*Id.* ¶ 10.)  Osorio is a Registered Nurse employed by WCHCC who has "management authority."  (*Id.* ¶¶ 31, 20.)

### 1.  The October 14, 2019 Incident

On October 14, 2019, Plaintiff was cleaning an operating room alongside two other PCTs after a surgery was performed therein.  (*Id.* ¶ 42.)  Plaintiff alleges that he was collecting the trash and medical waste and putting such waste "into specially marked trash containers."  (*Id.* ¶ 43.)  Pursuant to the direction of a (non-defendant) nurse, Plaintiff placed the trash containers in the corner of the room but did not throw the bags of trash out, as the surgical sponges and towels had not yet been counted to ensure none had been left in the patient's "inner cavities."  (*Id.* ¶¶ 39, 44.)  However, Steger "demanded Plaintiff go through the trash, find and remove *her* sponges from the bags," and then "demeaned him by analogizing him to a janitor."  (*Id.* ¶ 46 (emphasis in original).)  Plaintiff explained to Steger that he had been instructed to keep the sponges where they were until a count of them could be performed.  (*Id.*)  Moreover, Plaintiff alleges that, while he did not say so to Steger, "it would have been impossible to distinguish *her* bloody sponges from anyone else's" and that undertaking such a request could have resulted in a miscount.  (*Id.*)  Despite Plaintiff's explanation of the other nurse's instruction, once Plaintiff

---

[3] Read in full, Plaintiff's Amended Complaint alleges: "Yoakum has no apparent role at [WCHCC], supervisory or otherwise.  One could say he is a Jack of all Trades – a helpful thing for any institution.  Nevertheless, Yoakum revels in misusing the power he amassed; he abuses others.  He brags in the OR when he believes he succeeded in getting someone fired.  But Yoakum, who has the title of 'Director,' has no defined role at [WCHCC].  He is the Director of perhaps only himself and how to protect his job."  (*Id.* ¶ 10.)  So, too, does Plaintiff repeat this allegation later in the AC, referring to Yoakam as "a man with no clear role, supervisory or otherwise.  Yoakum asserts his perception of authority, and others back him up.  He brags about getting people fired."  (*Id.* ¶ 21.)

refused Steger's request, Steger allegedly "made threats" against Plaintiff, including "us[ing] profanity."  (*Id.* ¶ 47.)[4]

Following this exchange, Plaintiff alleges that he "went to the front desk where a Patient-Center Care Nurse sits" and tried to explain the incident that occurred in the operating room to that individual.  (*Id.* ¶ 48.)  Steger then "approached and stopped the conversation, cursing and pointing in Plaintiff's face, threatening to get him fired, and demanding that Plaintiff do something in conflict with the directions of the earlier nurse."  (*Id.* ¶ 49.)  Plaintiff stated that he then tried to walk away, "but Steger continued her barrage of threats, hostility, and profanity in front of several employees."  (*Id.* ¶ 50.)[5]

### 2.  Reactions to the October 14, 2019 Incident

At some undetermined time following the October 14 Incident between Plaintiff and Steger, Plaintiff spoke to Yoakum "about the threats, hostility, profanity, and misconduct" of Steger.  (*Id.* ¶ 51.)  Plaintiff also alleges that, at some undetermined point, Steger made

---

[4] Plaintiff also alleges Steger "said words to the effect of '[o]h, big man.  Come outside. Are you afraid of little old me?'" and called Plaintiff "'Sonny,' a quiet racial slur akin to 'boy.'" (*Id.* ¶ 18.)  However, it is unclear if this exchange occurred as a part of the October 14, 2021, incident or at another time.

[5] Again, the Amended Complaint does not articulate what, precisely, Steger said during this exchange.

comments about how "Plaintiff's being a male disqualified him from feeling intimidated or afraid," and the fact that their "disparity in size . . . spoke for itself." (*Id.* ¶ 52.)[6, 7]

On October 16, 2019, Plaintiff filed a complaint with WCHCC's Human Resources Department regarding the October 14 Incident. (*Id.* ¶ 53.) Plaintiff alleges that while the complaint was pending, rumors "spread throughout the workplace," and Plaintiff "sensed" that the rumors "caused the staff to distance themselves from Plaintiff." (*Id.* ¶¶ 54–55.) Plaintiff stated that these rumors, dovetailing the October 14 Incident, "caused him to lose confidence in himself and his work performance." (*Id.* ¶ 55.) Moreover, while Plaintiff's complaint was pending, "[WCHCC] knowingly continued to schedule Plaintiff to work alongside [Steger]." (*Id.* ¶ 56.)

On October 23, 2019, Plaintiff was scheduled to work with Steger, which prompted him to email Human Resources ("HR") "advising [HR] that he found it impossible to work with Steger." (*Id.* ¶ 58.) Plaintiff alleges that he "never received a response" to this email from HR and "after weeks of no response from [WCHCC], [Plaintiff] visited the Human Resources department" but was turned away. (*Id.* ¶¶ 59–60.) Plaintiff also alleges that he further asked other managers if they had heard anything regarding his complaint but was told only that "[p]robably nothing would happen because it was a female world." (*Id.* ¶ 61 (quotation marks

---

[6] The Court presumes that these comments were following the October 14 incident in light of the allegation's placement in the narrative arc of the Amended Complaint, i.e. following the description of the October 14 incident and following the post-Incident conversation with Yoakum. However, this is only a presumption, as Plaintiff once again fails to ground these comments in a specific location or time.

[7] Plaintiff avers that Steger "is a diminutive woman, in the range of 100–125 pounds." (*Id.* ¶ 52.) By contrast, Plaintiff alleges he is "genetically tall with a masculine build." (*Id.* ¶ 15.)

omitted).)  Plaintiff then filed an Equal Employment Opportunity Commission (EEOC) claim against WCHCC.  (*Id.* ¶ 62.)[8]

### 3.  The December 15, 2019 Car Accident and Subsequent Events

On December 15, 2019, Plaintiff was involved in a motor vehicle accident, which caused him several injuries and severe pain.  (*Id.* ¶ 63.)  Plaintiff was then arrested in association with the accident and transported to a medical center for an evaluation.  (*Id.* ¶ 64.)[9]  Plaintiff asserts that his "severe pain" increased in the days following the accident.  (*Id.* ¶¶ 64–65.)  Plaintiff "made every attempt to be at work but had no choice [but] to take from his bank of sick days," for which he asserts he "always provided a doctor's note" or an equivalent thereof to justify.  (*Id.* ¶¶ 66–67.)

Plaintiff alleges WCHCC retaliated against him by "marking days on Plaintiff's schedule as 'unpaid leave,' even though he had sick time with a valid medical excuse."  (*Id.* ¶ 68.)[10] Plaintiff states that he attempted to return to work, but "lingering physical issues delayed the effort," so "he decided to apply for short-term disability until he could recover."  (*Id.* ¶ 70.) Plaintiff avers that when WCHCC "learned of this plan . . . [it] made false accusations about [Plaintiff] to other staff, alleging that Plaintiff had made 'threats.'"  (*Id.* ¶ 71.)  WCHCC then announced "that it would terminate [Plaintiff] because of unscheduled absences,"

---

[8] Plaintiff alleges in his Amended Complaint that "there were severe miscommunications between [P]laintiff, [and] his attorney" regarding the EEOC claim.  (*Id.* ¶ 62 n.4.)

[9] The arrest was documented (B19649648-N) but was never docketed in a criminal court. (*Id.* ¶ 64 n.5.)  Plaintiff currently has a wrongful arrest case pending in this District, No. 20-CV-5995 (S.D.N.Y.).  (*Id.*)

[10] It is unclear from Plaintiff's Amended Complaint whether he attempted to invoke the FMLA to get time off.  The Amended Complaint states "[t]hough he tried, even though he did not invoke the FMLA … he was entitled to time off."  (*Id.* ¶ 67.)  The Complaint then states that the retaliation began "so quickly after [Plaintiff] insist[ed] on his civil rights."  (*Id.* ¶ 69.)

notwithstanding that such absences "were documented sick days following the accident." (*Id.* ¶ 72.)[11]

Osorio allegedly "wrote the termination letter as well as an accusatory email" following Plaintiff's termination. (*Id.* ¶ 20.)[12] Plaintiff also alleges that Osorio did not witness any incidents, instead "back[ing] the other discriminators reflexively," (*id.*); further, Plaintiff alleges that Osorio "did not even talk to Plaintiff" or "look at the surveillance tape," (*id.*)[13]

Following Plaintiff's termination, Defendants "erect[ed] a 'WANTED Poster' on the front door of the Medical Center," which stated Plaintiff had made threats to staff and was no longer permitted access to the building. (*Id.* ¶ 23; *see also id.* Ex. A.)[14] Plaintiff was soon after informed of the poster and filed the present Action. (*Id.* ¶ 73.)

B.  Procedural History

Plaintiff filed his complaint on April 27, 2021. (Dkt. No. 1.) On June 11, 2021, WCHCC filed a pre-motion letter outlining the grounds for their anticipated motion to dismiss. (Dkt. No. 13.) On June 15, 2021, Plaintiff filed a letter seeking leave to file an Amended Complaint, (Dkt. No. 15), which the Court granted on July 27, 2021, (Dkt. No. 19). Plaintiff filed his Amended Complaint on August 3, 2021. (Dkt. No. 24.)

---

[11] It is unclear what the stated reason for Plaintiff's termination was, as the Amended Complaint also asserts that Plaintiff was terminated "for being belligerent (or whatever choice epithet)." (*Id.* ¶ 20.)

[12] Plaintiff did not attach a copy of either the termination letter or the email to the pleadings, nor has either been submitted by the Parties in their submissions.

[13] Plaintiff does not identify the "other discriminators" nor what surveillance tape was available. (*See id.*)

[14] In the AC, Plaintiff incorrectly names the poster as Exhibit B. (*Compare id.* ¶ 23, *with* Ex. A, *and,* Ex. B.) Exhibits A and B are both appended to the AC on pages 21–23 of the ECF-Stamped pleading.

On October 20, 2021, Defendants filed the instant Motion and accompanying papers. (*See generally* Not. of Mot.; Decl. of Daniel Schudroff (Dkt. No. 32); Defs.' Mem.)[15]  Following an extension, (Dkt. Nos. 34, 36), on December 20, 2021, Plaintiff submitted his Opposition and accompanying papers, (*see* Mem. of Law in Opp. ("Pl.'s Mem.") (Dkt. No. 37); Decl. of Eugene Toussaint (Dkt. No. 38); Decl. of Garfield Williams (Dkt. No. 39)).  Defendants filed their Reply on January 19, 2022.  (*See* Reply Mem. of Law in Supp. ("Defs.' Reply Mem.") (Dkt. No. 40).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570.  However, if

---

[15] Although only one Defendant, WCHCC, filed a letter motion with the Court to hold a pre-motion conference, (*see* Dkt. No. 13), all Defendants jointly filed the instant Motion, (*see* Dkt. No. 31).

a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B. Analysis

At this stage, eight of Plaintiff's distinct claims remain intact: (1) race discrimination under § 1981 against all Defendants; (2) race discrimination under Title VII against WCHCC;

(3) race discrimination under NYSHRL against Individual Defendants; (4) sex discrimination under Title VII against WCHCC; (5) sex discrimination under NYSHRL against Individual Defendants; (6) retaliation under Title VII against WCHCC; (7) retaliation under NYSHRL against Individual Defendants; and (8) FMLA interference against all Defendants.  (*See* AC ¶¶ 74–133.)[16]  The Court reviews each claim or group of claims, where appropriate, separately.

### 1.  Race and Sex Discrimination Under § 1981, Title VII, and the NYSHRL

As summarized, Plaintiff asserts claims sounding generally in race and sex discrimination pursuant to § 1981, Title VII, and the NYSHRL against an array of defendants, depending on the claim.  (*See id.* ¶¶ 74–84, 114–120.)  Despite Plaintiff's distinct claims, and because race and sex discrimination claims brought under § 1981, Title VII, and the NYSHRL are all evaluated under the same framework, *see Mitchell v. N.Y.C. Dep't or Educ.*, No. 20-CV-1555, 2022 WL 621956, at *5 (S.D.N.Y. March 3, 2022), the Court evaluates all of Plaintiff's discrimination claims simultaneously.  Broadly speaking, Defendants argue that Plaintiff has not pled sufficient facts to

---

[16] Plaintiff's Amended Complaint initially included 12 causes of action against all Defendants.  Regarding the claims themselves, however, the Amended Complaint seemingly duplicates Counts 7 and 11, bringing identical claims of sex discrimination under Title VII against all Defendants.  (*Compare* AC ¶¶ 101–103, *with id.* ¶¶ 118–120.)  Therefore, the Court disregards the duplicated claim.  Additionally, "[c]ourts in this Circuit have presumed that plaintiffs have abandoned their claims when they do not oppose a motion to dismiss them." *Thurmand v. Univ. of Conn.*, No. 18-CV-1140, 2019 WL 369279, at *3 (D. Conn. Jan. 30, 2019) (collecting cases).  This Court follows suit, as Plaintiff has effectively abandoned his Eighth Claim (alleging violations of New York Sick Leave Law) and his Twelfth Claim (alleging breach of contract or, in the alternative, interference with contract or, in the alternative, breach of the covenant of good faith and fair dealing), stating that "Mr. Williams will not oppose dismissal of [such claims.]"  (Pl.'s Mem. 3 n.2.)  Finally, Plaintiff effectively withdraws his Ninth Claim (alleging violation of New York Labor Law § 741), insofar as he "concedes that the Labor Law § 741 claim does not lie for lack of a timely Notice of Claim."  (*Id.*)  This leaves the Court with the above-mentioned eight claims.

Regarding specific claims against specific defendants, Plaintiff also states that he does not oppose dismissal of all NYSHRL claims "against the Hospital."  (*Id.* at 3 n.1.)  Finally, Plaintiff also concedes that "established law in this Circuit disallows" litigants from bringing Title VII claims "against individual defendants."  (*Id.*)  Accordingly, these, too, are dismissed.

plausibly state any discrimination claim under any of the three statutes regarding either race or sex.  (Defs.' Mem. 11–14.)[17]

### a.  Applicable Law

Section 1981 requires that "[a]ll persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts … as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  Section 1981 thus prohibits racial discrimination "with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment[.]"  *Calvelos v. City of New York*, No. 19-CV-6629, 2020 WL 3414886, at *9 (S.D.N.Y. June 22, 2020) (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 224–25 (2d Cir. 2004)).  Further, a "plaintiff may allege that discrimination occurred in the form of discrete adverse employment actions," *Rubert v. King*, No. 19-CV-2781, 2020 WL 5751513, at *6 (S.D.N.Y. Sept. 25, 2020), as Plaintiff does here, (*see* AC ¶ 76).[18]

Title VII prohibits employers from discharging any individual "because of such individual's race" or "sex."  42 U.S.C. § 2000e-2(a)(1).  To establish a claim of discrimination under Title VII, a plaintiff must meet the burden of proving that the adverse employment decision was motivated, at least in part, by "an impermissible reason, such as race, ethnic origin, or gender."  *Fields v. N.Y. State Off. of Mental Retardation & Developmental Disabilities*, 115

---

[17] Defendants first argued in their Motion To Dismiss that the NYSHRL claim was defective against Individual Defendants because Plaintiff did not timely serve a notice of claim, however Plaintiff pointed out in his Reply that the notice of claim requirement is inapplicable to individual defendants.  (Pl.'s Mem. 10.)  Defendants do not contest this in their Reply, (*see* Defs.' Reply Mem. 2 (stating only that Plaintiff's claim fails on the merits)), so the Court considers this argument conceded and evaluates the discrimination claims' merits.

[18] "Although [§] 1981 does not itself 'specially authorize private lawsuits to enforce' its prohibitions, the Supreme Court has 'created a judicially implied private right of action.'" *Rubert*, 2020 WL 5751513, at *6 (alterations omitted) (quoting *Comcast Corp. v. Nat'l Ass'n of African Am.–Owned Media*, 140 S. Ct. 1009, 1015 (2020)).

F.3d 116, 119 (2d Cir. 1997).  "The NYSHRL mirrors these federal obligations."  *Brown v. Daikin Am., Inc.*, 756 F.3d 219, 226 (2d Cir. 2014).

      Claims for discrimination under § 1981, Title VII, and the NYSHRL are all analyzed under the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Brown,* 756 F.3d at 228–29 (discussing the *McDonnell Douglas* framework for Title VII); *Boncoeur v. Haverstraw-Stony Point Cent. Sch. Dist.*, No. 20-CV-10923, 2022 WL 845770, at *5 (S.D.N.Y. Mar. 22, 2022) (discussing the *McDonnell Douglas* framework for § 1981 and NYSHRL claims).  Under this framework, a plaintiff must first show that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802).  If a plaintiff successfully does so, the burden then shifts to the employer to demonstrate a legitimate, non-discriminatory purpose for the adverse employment action.  *See McDonnell Douglas*, 411 U.S. at 802.  Finally, if an employer satisfies this requirement, the burden shifts back to the employee to demonstrate, by a preponderance of the evidence, that the non-discriminatory reason was actually a pretext for discrimination.  *See id.* 804–05; *see also Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016) (articulating the three step *McDonnell Douglas* framework).

      Because "a plaintiff is not required to plead a prima facie case under *McDonnell Douglas*, at least as the test was originally formulated, to defeat a motion to dismiss," *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) (italics omitted), the Court need only concern itself with the first phase of the *McDonnell Douglas* framework, *see Munoz-Nagel v. Guess, Inc.*, No. 12-CV-1312, 2013 WL 6068597, at *1 (S.D.N.Y. Nov. 15, 2013) ("[A]

[p]laintiff need not make out a prima facie case at the pleading stage, and may withstand a motion to dismiss by providing a short and plain statement of the claim that shows that she is entitled to relief that gives [the defendant] fair notice of the . . . discrimination claim and the grounds upon which it rests." (italics and citation omitted)).  And "[a]lthough [the] [p]laintiff need not allege facts sufficient to make out a prima facie case for any of [his] discrimination claims in her [c]omplaint, the elements thereof provide an outline of what is necessary to render [his] claims for relief plausible." *Sommersett v. City of New York*, No. 09-CV-5916, 2011 WL 2565301, at *5 (S.D.N.Y. June 28, 2011) (italics omitted); *see also Littlejohn v. City of New York*, 795 F.3d 297, 311 & n.9 (2d Cir. 2015) (noting that while a plaintiff need not plead a prima facie case of discrimination, "the elements of a prima facie case may be used as a prism to shed light upon the plausibility of the claim" (quotation marks omitted)); *Ndremizara v. Swiss Re Am. Holding Corp.*, 93 F. Supp. 3d. 301, 312 (S.D.N.Y. 2015) (collecting cases); *Barker v. UBS AG*, No. 09-CV-2084, 2011 WL 283993, at *5 (D. Conn. Jan. 26, 2011) ("[E]ven though establishing a prima facie case of . . . discrimination is not necessary to survive a motion to dismiss, courts do use the standard as a guidepost when determining whether the plaintiff has provided the defendant with fair notice of her claim, as required by the Federal Rules of Civil Procedure.").

In this Action, Defendants apparently concede that Plaintiff meets the first three elements of a prima facie case regarding both sex and race discrimination.  (*See* Defs.' Mem. 11–14) (focusing solely on the fourth element).)  Therefore, the Court's determination as to the plausibility of Plaintiff's claims effectively turns on whether Plaintiff has adequately alleged "an inference of discrimination." *Weinstock*, 224 F.3d at 42.  On this question, "a plaintiff need only give plausible support to a *minimal inference* of a discriminatory motivation." *Vega*, 801 F.3d at

84 (quotation marks omitted) (emphasis added).  Nevertheless, "a discrimination complaint . . . must [still] at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." *EEOC v. Port Auth. Of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (alteration and quotation marks omitted).

A showing of an "inference of discriminatory motivation may be supported directly, such as by statements that an adverse employment action was related to [the] plaintiff's protected class, . . . or indirectly by an allegation that [the] plaintiff was treated different from and less favorably than similarly situated peers." *Roache v. Long Island Railroad*, 487 F. Supp. 3d. 154, 172 (E.D.N.Y. 2020) (first citing *Haskell v. Kaman Corp.*, 743 F.2d 113, 119 (2d Cir. 1984); and then *Marquez v. Starrett City Assocs.*, 406 F. Supp. 3d 197, 208–09 (E.D.N.Y. 2017)).  "Clearing this low pleading threshold 'entitles the plaintiff to the temporary presumption of *McDonnell Douglas* until the defendant furnishes its asserted reasons for its action against the plaintiff,'" *id.* (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 55 (2d Cir. 2016)), "the evaluation of which is more appropriately considered at summary judgment or at trial," *id.* (citing *Levy v. Legal Aid Soc'y*, 408 F. Supp. 3d 209, 216 (E.D.N.Y. 2019)).  Alternatively, "[the] plaintiff also may create a 'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination." *Stinnett v. Delta Air Lines, Inc.*, 278 F. Supp. 3d 599, 611–12 (E.D.N.Y. 2017) (quoting *Vega*, 801 F.3d at 87).

Further, "[a]n inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms,'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 47, 502 (2d Cir. 2009)), or "terms that degrade plaintiff's gender," *McDonough v. New York Dept. of Educ.*, No. 16-CV-4272, 2018 WL 4636834, at *5 (S.D.N.Y. Sept. 27, 2018) (alterations omitted).

b.  Race Discrimination Analysis

Plaintiff asserts that "[b]ut for [r]acism, Plaintiff would not have lost his job."  (AC ¶ 76.)

Plaintiff alleges only the use of "coded language," Osorio's actions, and the use of a "wanted

poster" to suggest a racial motive.  (*See id.* ¶¶ 36, 20, 23–25; *see also* Pl.'s Mem. 12–17.)[19]  As

stated above, Defendants concede that Plaintiff has pled enough facts to plausibly meet the first

three elements of a prima facie case of race discrimination, (*see* Defs.' Mem. 11 (focusing solely

on the fourth element)), but argue that Plaintiff has failed to plead facts sufficient to "support[]

an inference of [racial] discrimination sufficient to survive" a motion to dismiss, (Defs.' Reply

Mem. 6).

i.  Steger's Comments

As stated above, a cornerstone of Plaintiff's claim is Steger's language.  (*See* Pl.'s Mem.

16–17.)  The alleged comments on which Plaintiff relies are Steger's calling Plaintiff "Boy,"

"Little Boy," "Sonny," "Janitor," and "Big Man."  (*Id.* at 16 (citing AC ¶ 18).)[20]

In the first instance, two of the five alleged terms to which Plaintiff points do not speak to

his race.  Plaintiff does not explain how calling someone "Big Man" speaks to his *race*; at best,

this is an aspersion as to Plaintiff's size and underhandedly implies a lack of intelligence.  *Cf. 9*

*Common Character Tropes & Tips for Avoiding Them*, Masterclass (June 7, 2021),

---

[19] Plaintiff's Memorandum also repeatedly incorrectly refers to Steger as "Sterger."  (*See generally* Pl.'s Mem.)  The Court nonetheless refers to this Defendant by her correct name.

[20] Plaintiff's clarity regarding Steger's use of these terms "Boy" and "Little Boy" leaves much to be desired.  Indeed, the paragraph in the Amended Complaint on which Plaintiff's briefing papers rely reads in relevant part: "She also called him 'Sonny,' a quiet racial slur akin to 'boy' – a word she used as preceded by 'little.'"  (AC ¶ 18.)  Elsewhere in the Amended Complaint, however, Plaintiff states that Steger's "coded language" was comprised of only four terms: "Janitor, Boy, Big Man, [and] Sonny."  (*Id.* ¶ 36.)  Ultimately, the Court considers all five terms in light of this uncertainty.

https://www.masterclass.com/articles/common-character-tropes-and-tips-for-avoiding-them#what-are-character-tropes (discussing the "dumb muscle" trope).  The same is true with regard to Steger's "analogizing [Plaintiff] to a janitor."  (AC ¶ 46).  That title, "demeaning" or not, (*id.*), in no way speaks to Plaintiff's race.  Indeed, Plaintiff concedes the latter term lacks racial overtones, stating that the word "[j]anitor . . . is *caste*-pejorative.  (*Id.* ¶ 7.)[21]  Thus, these five allegations of coded language reveal only three viable allegations of racially-charged language: "Boy," "Little Boy," and "Sonny."  (*Id.* ¶ 36.)

Adopting this narrower but non-zero subset of racially charged terms—or even adopting arguendo that all five terms are racially charged—the Court nonetheless finds Plaintiff's allegations lacking insofar as Plaintiff fails to plausibly connect these alleged comments to his actual firing.  Plainly, Plaintiff fails to allege that a decision-maker who had control over Plaintiff's employment or termination made any discriminatory remarks.

Courts in this Circuit have repeatedly granted motions to dismiss where the inference of discriminatory intent rests on stray remarks made by those outside of the plaintiff's chain of command.  *See, e.g.*, *Richards v. City of New York*, No. 19-CV-10697, 2021 WL 4443599, at *7 (S.D.N.Y. Sept. 28, 2021) (dismissing a claim of employment discrimination based on an isolated allegedly discriminatory comment made by a co-worker); *Toney v. Prob. Dep't*, No. 15-CV-561, 2016 WL 859381, at *5–6 (E.D.N.Y. Jan. 28, 2016) (finding that stray race-based comment that "black people live in filth" made by fellow employee with no decision-making

---

[21] In fact, Plaintiff overtly concedes that the term "in and of itself, would not be discriminatory, but in context . . . it can be."  (Pl.'s Mem. 16.)  However, Plaintiff fails to spell out this context—the AC is devoid of any specifics as to the "context, inflection, tone of voice" (*id.* (quoting *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006))), with regard to when, where, or how Steger allegedly deployed the term, including if it was made during the October 14, 2019 incident or elsewise.

authority over plaintiff's position was insufficient to plead discrimination claim), *report & recommendation adopted*, 2016 WL 868206 (E.D.N.Y. Mar. 4, 2016); *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 249 (E.D.N.Y. 2015) (dismissing a plaintiff's discrimination claims where the plaintiff failed to allege that "anyone with control over the decision to fire [the plaintiff] made [the alleged discriminatory] comments").

In this Action, Plaintiff alleges only that Steger used racially-coded language, but Plaintiff fails to allege that Steger directly oversaw Plaintiff's employment or termination. (*See generally* AC; *see also id.* ¶ 9 (alleging only that Steger had "vast seniority" over Plaintiff without saying specifically that she was his supervisor).) Rather, Plaintiff alleges that Yoakum executed Plaintiff's termination while failing to allege that Yoakum made any discriminatory remarks. Because "it has been settled that stray remarks by a non-decision maker are insufficient to establish a prima facie case of . . . discrimination," Steger's "comments have no bearing on the instant case." *Cai v. Wyeth Pharm., Inc.*, No. 09-CV-5333, 2012 WL 933668, at *7 (S.D.N.Y. Mar. 19, 2012) (italics omitted),

Plaintiff attempts to end-run this body of law in several ways, none of which are persuasive. First, Plaintiff tries to argue that Steger did, in fact, have decision-making authority. To do so, Plaintiff contends: "[b]ecause she was his superior and outranked him at the Hospital, it is appropriate to accept as true for this motion that she did have the power and authority to carry out her threat and otherwise to affect the terms and conditions of his employment." (Pl.'s Mem. 15 (citing AC ¶ 49).) So, too, does Plaintiff claim that "whether Sterger [sic] . . . had supervisory power over [Plaintiff] is a question of fact; a court in a pleading must accept this allegation as accurate." (*Id.* at 17.)

This is incorrect; the Amended Complaint is devoid of any allegations that Steger had

any hiring or firing prerogative.  Indeed, the paragraph on which Plaintiff relies to argue that

Steger had such power states *only* that Steger interrupted Plaintiff's conversation with Vinny and

issued the threat.  (*See* AC ¶ 49.)  In other words, at no point does Plaintiff allege that Steger has

such power, and the Court "may not 'invent factual allegations that [the plaintiff] has not pled.'"

*Wilson v. Triller, Inc.*, No. 21-CV-11228, 2022 WL 1138073, at *10 (S.D.N.Y. Apr. 18, 2022)

(alteration in original) (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)).  And, as

for Plaintiff's argument that Steger was a supervisor, Plaintiff himself expressly disavows this,

stating that throughout the events giving rise to this Action, "[*Steger*] *was not Plaintiff's*

*supervisor, then or ever*," (AC ¶ 50 (emphasis added)).

Because Plaintiff fails to allege that Steger was a supervisor, and because the Court must

accept the *latter* allegation as made in the Amended Complaint, Plaintiff cannot plausibly argue

that Steger's comments are those of a decision-maker.  And because it remains the case that, as

the Second Circuit has held, "remarks made by someone *other than the person who made the*

*decision* adversely affecting the plaintiff may have little tendency to show that the decision-

maker was motivated by the discriminatory sentiment expressed in the remark," *Tomassi v.*

*Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) (emphasis added) (collecting cases)—a

holding that was not qualified as to the commenter's comparative authority, *see id.*—such

comments, even from someone who outranks a litigant, do not create an inference of

discrimination, *see Paul v. Postgraduate Ctr. For Mental Health*, 97 F. Supp. 3d 141, 170–71

(E.D.N.Y. 2015) (finding the plaintiff had "not presented a plausible inference of discrimination"

where derogatory comments were made because those comments were made by co-workers who

"never had any decision-making authority"); *see also Dixon v. Int'l Fed'n of Accountants*, 416 F.

App'x 107, 110 (2d Cir. 2011) (summary order) (affirming the district court's finding that the plaintiff failed to establish an inference of discrimination where the plaintiff's pointed only to "an isolated derogatory remark made by [a co-worker] who played no role in [the plaintiff's] termination").

Were the Court to nonetheless adopt, arguendo, Plaintiff's sought-after inference that Steger be considered a decision-maker by virtue of her superiority, it remains the case that Plaintiff's allegations still fall short. The Second Circuit has long held that "the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination," *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001). This is because "[o]nly where decision-makers repeatedly make comments that *draw a direct link between a plaintiff's membership in a protected class and adverse employment action* can an inference of discriminatory animus be drawn." *Jowers v. Family Dollar Stores, Inc.,* No. 09-CV-2620, 2010 WL 3528978, at *3 (S.D.N.Y. Aug. 16, 2010) (emphasis added) (citation and quotation marks omitted), *aff'd*, 455 F. App'x 100 (2d Cir. 2012).

While Plaintiff alleges that Steger "openly threated to get [Plaintiff] fired," (Pl.'s Mem. 15 (citing AC ¶ 49)), Plaintiff's allegations regarding getting Plaintiff fired is unconnected to his status in a protected class. Plaintiff's allegation reads in full:

> Steger approached and stopped the conversation, *cursing and pointing in Plaintiff's face, threatening to get him fired, and demanding that Plaintiff do something in conflict with the directions of the earlier nurse.*

> Plaintiff could not ethically do so; he was instructed differently by the other nurse who had been part of the surgery. Garfield attempted to walk away, but Steger continued her barrage of threats, hostility, and profanity in front of several employees and staff. She was not Plaintiff's supervisor, then or ever. She just hated Plaintiff and wanted to goad Plaintiff into anger.

(AC ¶¶ 49–50 (emphasis added).) As the allegations themselves make clear, Plaintiff does not allege that any threat as to Plaintiff's employment was made *because* of his race. Rather, the

"[t]he timing and context of the remark"—following an altercation where the commenter

believed Plaintiff to be disobeying an order—"make clear that it was wholly unrelated to the

decision-making process." *Richards*, 2021 WL 4443599, at *7 (granting a motion to dismiss

where the lone allegation concerning discrimination was a "stray remark" made at "a staff

meeting more than one month before [the] [p]laintiff's termination" because "[t]he timing and

context of the remark . . . make clear that it was wholly unrelated to the decision-making

process" that resulted in the plaintiff's termination).  Moreover, "[t]he time lapse between the

remarks and the adverse employment action suggests that the incidents were not related."

*Mesias v. Cravath, Swaine & Moore LLP*, 106 F. Supp. 3d 431, 438 (S.D.N.Y. 2015) (dismissing

a discrimination claim where two comments made a year and a half and three months prior to the

plaintiff's termination, respectively, were insufficient to establish a nexus given the time lapse);

*see also Richards*, 2021 WL 4443599, at *7 (granting a motion to dismiss where the lone

allegation concerning discrimination was a "stray remark" made at "a staff meeting more than

one month before [the] [p]laintiff's termination," because "[t]he timing and context of the remark

. . . make clear that it was wholly unrelated to the decision-making process" that resulted in the

plaintiff's termination); *Del Franco v. N.Y.C. Off-Track Betting Corp.*, 429 F. Supp. 2d 529, 537

(E.D.N.Y. 2006) (finding no temporal connection where "slightly more than three months"

elapsed between alleged discriminatory statements and termination), *aff'd*, 245 F. App'x 42 (2d

Cir. 2007); *Rinsler v. Sony Pictures Entm't, Inc.*, No. 02-CV-4096, 2003 WL 22015434, at *6

(S.D.N.Y. Aug. 25, 2003) (finding stray remark insufficient to create an inference of

discrimination where the remark was made three months before the plaintiff's transfer); *cf.*

*Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 162–63 (2d Cir. 1998) (denying a motion for a

judgment as a matter of law, rejecting the label "stray" for an age-related remarks—and

upholding the importance of such remarks in an age-discrimination action—where decision-makers made such comments just before the plaintiff's termination).

In sum, the Court concludes that allegations regarding Steger's comments do not give rise to an inference of discrimination insofar as Plaintiff's termination.

### ii.  Osorio's Actions

Plaintiff implicitly suggests in the Complaint—though not in his briefing—that the decision-maker test has been met by virtue of Osorio's adopting Steger's comments and point of view, thereby infecting his decision to terminate Plaintiff.  Specifically, Plaintiff alleges that "Osorio . . . backed the other discriminators reflexively," "did not . . . talk to Plaintiff" prior to firing Plaintiff, or even "look at a surveillance tape" prior to writing Plaintiff's "termination letter as well as an accusatory email."  (AC ¶ 20.)  So, too, does Plaintiff allege that Osorio "reflexively sided with [Steger]."  (*Id.* ¶ 22.)  This argument, too, fails.

Plaintiff does not articulate what, exactly, he means when he alleges that Osorio "backed" or "reflexively sided with" Steger or others, particularly in the context of discriminatory remarks or actions.  However, to the extent Plaintiff means to suggest that he adopted Steger's views, Plaintiff begins to make a "cat's paw" argument; indeed, Plaintiff actually says in the Amended Complaint that "[o]ne might call Osorio [sic] the 'Cat's Paw' in this awful fable."  (AC ¶ 21.)  As the Second Circuit explained:

> The phrase derives from an Aesop fable, later put into verse by Jean de La Fontaine, in which a wily monkey flatters a naïve cat into pulling roasting chestnuts out of a roaring fire for their mutual satisfaction; the monkey, however, devours them fast, leaving the cat with a burnt paw and no chestnuts for its trouble.  Injected into United States employment discrimination law by Judge Richard Posner in 1990, the "cat's paw" metaphor now refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action.  Because the supervisor, acting as agent of the employer, has permitted

> himself to be used as the conduit of the subordinate's prejudice, that prejudice may
> then be imputed to the employer and used to hold the employer liable for
> employment discrimination.  In other words, by merely effectuating or rubber-
> stamping a discriminatory employee's unlawful design, the employer plays the
> credulous cat to the malevolent monkey and, in so doing, allows itself to get
> burned—i.e., successfully sued.

*Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 271–72 (2d Cir. 2016) (alterations,

citations, and quotation marks omitted).  However, Plaintiff expressly disavows this argument in

his next words: "[B]ut Osorio was no mere conduit.  He was the conductor."  (AC ¶ 20.)

Further, Plaintiff does not mention this line of argument in his opposition papers.  (*See generally*

Pl.'s Mem.)  Therefore, the Court looks only to the conduct Plaintiff alleges Osorio undertook,

which include failing to speak to Plaintiff, failing to review impliedly exculpatory surveillance

tapes, and writing both Plaintiff's termination letter as well as an allegedly "accusatory" email.

(*See generally* AC.)

Plaintiff puts forward only conclusory allegations as to how any of these actions or

inactions was discriminatory.  (*See generally id.*)  For example, with regard to the termination

letter and accusatory email, Plaintiff alleges only that Osorio wrote them simply because "[h]e

backed the other discriminators reflexively."  (AC ¶ 20.)  Once again, after disavowing Osorio as

a "conduit," Plaintiff offers no allegations as to how or why Osorio's authoring of those pieces—

assumed true at this stage—were the result of Plaintiff's race.[22]  "Without further context, that

allegation does not come close to satisfying Plaintiff's burden."  *Butts v. New York City Dep't of*

*Educ.*, No. 16-CV-5504, 2018 WL 4725263, at *11 (E.D.N.Y. Sept. 28, 2018).  And with regard

to Plaintiff's allegation that he did not talk to Plaintiff nor watch the surveillance tape, Plaintiff

---

[22] Indeed, Plaintiff concedes that Defendants, including Osorio, offered multiple non-discriminatory reasons he was terminated, including "for being belligerent," (*id.* ¶ 20), and "because of unscheduled absences," (*id.* ¶ 72), which more naturally align with the contents of an "accusatory" email.

once again fails to "connect the dots between the alleged adverse actions and his membership in a protected class." *Acosta v. City of N.Y.*, No. 11-CV-856, 2012 WL 1506954, at *4 (S.D.N.Y. Apr. 26, 2012).  In other words, Plaintiff fails to explain with any degree of detail how these actions were taken "because of" the protected characteristic at issue, which is "an essential element of an employment discrimination under federal law." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 581 (S.D.N.Y. 2011) (observing that an alleged adverse employment action was taken "because of" the protected characteristic at issue is "an essential element of an employment discrimination under federal law").

In sum, "[t]hese naked allegations do not give rise to an inference of racially discriminatory intent." *Gaddy v. Waterfront Comm'n*, No. 13-CV-3322, 2014 WL 4739890, at *5 (S.D.N.Y. Sept. 19, 2014).  Therefore, Plaintiff fails to plausibly allege discrimination via Osorio's actions.

### iii.  Wanted Poster

Plaintiff also points to the "wanted poster" as indicative of discriminatory intent, alleging that the sign was "grounded in a racist trope that permeates society" and likens the poster to "discriminatory ridicule."  (*Id.* ¶¶ 25, 76.)  No Party argues at length about the Poster and its tendency to give rise to an inference of discrimination in their memoranda.  (*See generally* Defs.' Mem.; Pl.'s Mem.; Defs.' Reply Mem.)  Moreover, the Court is unaware of any apposite caselaw regarding a poster hung at the same time (or at least on the same day) an adverse employment action was taken as giving rise to an inference of discrimination—or not.  However, "when there is reliable objective evidence . . . the evidence may speak for itself," *Marcavage v. City of New York*, 689 F.3d 98, 110 (2d Cir. 2012) (citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)), and the poster itself undermines Plaintiff's claim.

Simply put, the poster never states that Plaintiff is "wanted" but rather that he "is not permitted to access [WCHCC]" unless he is being treated or if he is authorized to enter for a business transaction.  (*See* AC Ex. A.)  The poster also includes the date it was posted, namely February 20, 2020, the same day Plaintiff was fired for, as Plaintiff concedes, being "belligerent."  (*Id.* ¶ 5; *id.* ¶ 20.)[23]  Indeed, the poster states expressly that the reason he is not permitted to enter because he "has made threats" against the staff; in other words, that the poster fails in *any* way to allude to, hint at, or suggest that Plaintiff's absence of permission is connected to his race fails to substantiate Plaintiff's assertion that the poster "reinforce[s] the earlier racial stereotypes"—which Plaintiff does not himself articulate—or to "warn others of the angry black man."  (*Id.* ¶¶ 24, 23.)  Indeed, the Court finds it notable that the picture used on the poster features Plaintiff in formal attire sporting a smile rather than trying to portray him as, in fact, "angry."  (*Id.* Ex. A.)  That Plaintiff argues anything otherwise strains credulity.

Taking all of the allegations in the Amended Complaint as true, as the Court must at this procedural posture, it is clear that Plaintiff strongly believes the actions of the Defendants were rooted in discrimination.  However, in reviewing the sufficiency of a complaint's allegations, a plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination." *Brodt v. City of New York*, 4 F. Supp. 3d 562, 568 (S.D.N.Y. 2014) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 456 (2d Cir. 1999) (alterations and quotation marks omitted)).  "But without sufficient facts, even the most sincerely held beliefs [of discrimination] do not comprise a sufficient basis for withstanding a [motion to dismiss]." *Williams v. Wellness Med. Care, P.C.*, No. 11-CV-5566, 2013 WL 5420985, at *6 (S.D.N.Y. Sept. 27, 2013).  Rather,

---

[23] This date is known based on Plaintiff's Notice of Claim and EEOC charge, even if it is not stated anywhere in the Amended Complaint.  (Defs.' Mem. 3 n.3.)

Plaintiff's allegations, at best, fall into the familiar "recitation of a false syllogism: (1) I am (insert name of a protected class); (2) something bad happened to me at work; (3) therefore, it happened because I am (insert name of protected class)." *Bermudez*, 783 F. Supp. 2d at 581. Because Plaintiff has failed to plausibly allege that Steger's comments, Osorio's actions, or the poster were directly related to Plaintiff's firing, and because Plaintiff fails to plausibly allege that Plaintiff's termination "was related to [his] protected class," *Roache*, 487 F. Supp. 3d. at 172, Plaintiff fails to plausibly allege "an inference of discrimination" necessary to his racial discrimination claims, *Littlejohn*, 795 F.3d at 312.  The Court therefore grants Defendants' Motion with respect to all of Plaintiff's claims sounding in race discrimination.

<u>c.  Sex Discrimination Analysis</u>

As with race discrimination, Defendants again appear to concede that Plaintiff meets the first three elements of a prima facie case of sex discrimination.  (*See* Defs.' Mem. 11.) Defendants once more rest their argument on the fact that that Steger's comments towards Plaintiff do not "support[] an inference of [sex] discrimination sufficient to survive" a motion to dismiss.  (Defs.' Reply Mem. 6.)  And, once more, the Court agrees.

Plaintiff points to the same "coded language" Steger allegedly deployed, namely "Boy," "Little Boy," "Sonny," "Janitor," and "Big Man."  (Pl.'s Mem. 16.)  While these words far more clearly implicate Plaintiff's sex—"boy," "Sonny," and "Man" all by definition speak to Plaintiff's sex—these alleged comments fail to meet Plaintiff's burden for the same reasons discussed above, namely Steger's dubious decision-making authority and a lack of connection alleged between the comments and Plaintiff's firing, which occurred months after.  *See supra* II.B.1.b.i (detailing Plaintiff's inadequate allegations insofar as Steger, despite allegedly being hierarchically superior to Plaintiff, was not the decision-maker to have fired Plaintiff).

Additionally, the Court's reasoning articulated above holds and applies with equal measure regarding Osorio's actions and the wanted poster vis-à-vis Plaintiff's gender: allegations concerning the former do not adequately connect Osorio's actions to Plaintiff's gender, and allegations concerning the latter fail to show discriminatory intent, particularly when taken after the adverse action in question. *See supra* II.B.1.b.ii–iii.

There exist, however, two additional allegations with respect to Plaintiff's sex: (1) Plaintiff further alleges that after he filed a complaint with Human Resources regarding Steger's actions during the October 14, 2019 incident, Steger commented that "being [] a male disqualified him from feeling intimidated or afraid," (AC ¶ 52), and (2) when Plaintiff did not receive a response regarding his complaint from Human Resources, he was told that "[p]robably nothing would happen because it was a female world," (*id.* ¶¶ 59–61). These alleged comments fail to establish Plaintiff's burden.

Both comments lack any nexus to Plaintiff's firing. Indeed, Plaintiff does not allege that he was "intimidated or afraid," nor does he allege that he was fired *because* he was "intimidated" or "afraid." (*See generally id.*) Moreover, these comments were made in the context of Plaintiff's complaint to Human Resources, namely that Plaintiff's complaint would not receive due consideration, let alone vindication, as a result of his gender. (Pl.'s Mem. 15.) In other words, there remains no connection between this comment and the adverse action that befell Plaintiff. *See Sethi v. Narod*, 12 F. Supp. 3d 505, 543 (E.D.N.Y. 2014) ("Where remarks are unrelated to a decision taken with respect to a plaintiff, they are not probative of discriminatory intent." (collecting cases)).[24]

---

[24] To the extent Plaintiff implies that either WCHCC's failure to investigate his complaint and his assignment to work with Steger after the complaint constitute adverse employment

Accordingly, even viewing the allegations in the light most favorable to Plaintiff, the Amended Complaint fails to plausibly allege discriminatory intent, and therefore, Plaintiff's sex discrimination claims on both the federal and state levels cannot survive Defendants' Motion.[25]

## 2.  Retaliation Under Title VII and the NYSHRL

Plaintiff also asserts claims sounding in retaliation pursuant to Title VII and the NYSHRL.  (*See* AC ¶¶ 85–93.)  Defendants argue that Plaintiff failed to allege that he engaged in a protected activity upon which a retaliation claim can be based, and that there "is no causal connection between Plaintiff's purported protected activity and the adverse employment action he later suffered."  (Defs.' Mem. 18; *see also id.* at 18–20; Defs.' Reply Mem. 8–9.)  The Court reviews each element and argument relating thereto in turn.

---

actions sufficient to support a sex discrimination claim, (*see* AC ¶ 115; Pl.'s Mem. 15), courts in the Second Circuit have consistently held that a "failure to investigate [a] plaintiff's complaints does not constitute an adverse employment action," *Kelly v. N.Y. State Off. of Mental Health*, 200 F. Supp. 3d 378, 396 (E.D.N.Y. 2016) (citing *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010)); *see also Day v. City of New York*, No. 15-CV-4399, 2015 WL 10530081, at *8 (S.D.N.Y. Nov. 30, 2015) ("While *Fincher* did not address whether a failure to investigate is adverse in the context of a discrimination claim, as is the case here, courts within this circuit have extended *Fincher* to reach direct discrimination claims." (collecting cases)). Further, "Plaintiff's allegations that []he was forced to work with a hostile co-worker and was ignored by h[is] supervisors are not adverse employment actions."  *Kelly*, 200 F. Supp. 3d at 396. Accordingly, the Court need not determine if Plaintiff has shown a causal connection between his complaint and WCHCC's failure to investigate or the scheduling of Plaintiff with Steger.

[25] Beyond the circumstances leading to a plaintiff's adverse employment event, an employer's efforts "to seek applicants from persons of the plaintiff's qualifications to fill that position . . . or the more favorable treatment of employees not in the protected group" could give rise to an inference of discrimination.  *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).  No such allegations were included in the AC with regard to either Plaintiff's racial or sex discrimination claims, (*see generally* AC), and the Court therefore declines to discuss them in greater depth.

a.  Applicable Law

"Title VII forbids an employer from discriminating against an employee because the employee 'has opposed any practice made an unlawful employment practice by [Title VII], or because []he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter.'" *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 330 (S.D.N.Y. 2020) (quoting 42 U.S.C. § 2000e-3(a)).  "The NYSHRL similarly makes it unlawful for an employer to retaliate or discriminate against an employee because []he 'has opposed any practices forbidden under this article or because . . . []he has filed a complaint, testified, or assisted in any proceeding under this article.'"  *Id.* (quoting N.Y. Exec. Law § 296(7)).  Since "[t]he standards for evaluating . . . retaliation claims are identical under Title VII and the NYSHRL," *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (citing *Weinstock*, 224 F.3d at 42 n.1), the Court evaluates these claims together.[26]

As with Plaintiff's discrimination claims, Plaintiff's retaliation claims are analyzed using the *McDonnell Douglas* burden-shifting framework, focusing on the plausibility of Plaintiff's claims at this stage.  *See Kelly*, 716 F.3d at 14–17.  And, again as is the case with Plaintiff's discrimination claims, while a "plaintiff 'need not plead a prima facie case' of retaliation" to "withstand a motion to dismiss," *Wilson v. Fam. Dollar Stores*, No. 06-CV-639, 2007 WL 952066, at *8 (E.D.N.Y. Mar. 29, 2007) (quoting *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 515 (2002)), courts nonetheless use the prima facie standard as a "guidepost when determining whether plaintiff has pled sufficient facts," *Ulrich v. Moody's Corp.*, No. 13-CV-8, 2014 WL

_____

[26] As with Plaintiff's race discrimination claims, Plaintiff brings the Title VII claim against both Individual Defendants and WCHCC, whereas he brings the NYSHRL claim against *only* Individual Defendants.  (Pl.'s Mem. 9–10.)

12776746, at *17 (S.D.N.Y. Mar. 31, 2014), *report and recommendation adopted as modified on other grounds*, 2014 WL 4977562 (S.D.N.Y. Sept. 30, 2014).  "To make out a prima facie case of retaliation, a plaintiff must demonstrate that '(1) [he] engaged in a protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action."  *Kelly*, 716 F.3d at 14 (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)).

b.  Application

i.  Plaintiff's Participation in a Protected Activity

"For purposes of determining whether an activity is protected, [Title VII] includes 'both an opposition clause and a participation clause."  *Littlejohn*, 795 F.3d at 316 (quoting *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 48 (2d Cir. 2012)).  "The opposition clause makes it unlawful for an employer to retaliate against an individual because [he] 'opposed any practice' made unlawful by Title VII, while the participation clause makes it unlawful to retaliate against an individual because [he] 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under' Title VII."  *Id.* (quoting *Townsend*, 679 F.3d at 48).  The Supreme Court has held that "[w]hen an employee communicates to [his] employer a belief that the employer has engaged in a form of employment discrimination, that communication *virtually always* constitutes the employee's *opposition* to that activity."  *Crawford v. Metro. Gov't of Nashville & Davidson County*, 555 U.S. 271, 276 (2009) (first emphasis added) (alteration and quotation marks omitted).  Accordingly, the alleged activities at issue in this Action concern the opposition clause.

Diving deeper, the form of the communication is immaterial; the Second Circuit has held that "protected activities" include "making complaints to management, writing critical letters to

29

customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)), *superseded on other grounds by* N.Y.C. Local L. No. 85.  Rather, the content of the communication is the primary consideration, as an employee's communication to management qualifies as a "protected activity" *only* where "the employee has a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'"  *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001) (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)).  To that end, "[m]ere subjective good faith belief is insufficient, the belief must be reasonable and characterized by *objective* good faith." *Sullivan-Weaver v. N.Y. Power Auth.*, 114 F. Supp. 2d 240, 243 (S.D.N.Y. 2000) (emphasis in original) (citation omitted).[27] Conversely, a complaint regarding "unprofessional conduct" that do not sound in discrimination is not considered a protected activity.  *Roman-Malone v. City of New York*, No. 11-CV-8560, 2013 WL 3835117, at *8 (S.D.N.Y. July 25, 2013) (dismissing retaliation claims where the complaints concerned non-discriminatory misconduct, as "[s]uch 'unprofessional conduct' is not statutorily prohibited"); *see also Gonzalez v. NYU Langone Med. Ctr.*, No. 18-CV-1797, 2019 WL 4194313, at *5 (S.D.N.Y. Sept. 3, 2019) (collecting cases) ("[M]ere complaints of unfair treatment without reference to any protected characteristic are insufficient to state a Title VII

---

[27] Indeed, "[a] plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful 'so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'"  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (second alteration in original) (quoting *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999)).

retaliation claim.").  The question, then, is whether Plaintiff's complaints contained a good-faith, objective, reasonable belief that employment law was being violated.

In this Action, Plaintiff alleges six events that could be considered protected activities: (1) Plaintiff made an informal, verbal complaint to an on-duty nurse about the incident the day it occurred, which Steger interrupted; (2) Plaintiff made an informal, verbal complaint to Yoakum regarding the incident; (3) Plaintiff filed a formal complaint with Human Resources regarding the incident "two days later"; (4) Plaintiff "filed another complaint around October 23, 2019" after Plaintiff was scheduled to work with Steger again; (5) Plaintiff made an informal, verbal complaint in the form of a conversation with an unnamed manager who essentially stated his complaint would not alter the status quo "because it was a female world"; and (6) Human Resources refused to respond to emails regarding the misconduct or to speak with him directly. (Pl.'s Mem. 20–21.)  "All of these allegations," Plaintiff argues, "add up to engaging in protected activity."  (*Id.*)  By contrast, Defendants argue that such interactions "concerning the sponge incident [do not] qualify as opposing discrimination."  (Defs.' Mem. 8.)  "Both Parties are right, and both Parties are wrong."  *Haywood v. Annucci*, No. 18-CV-10913, 2022 WL 4357648, at *8 (S.D.N.Y. Sept. 20, 2022).

Only the first two allegations contain any specific or detailed facts regarding Plaintiff's potentially discriminatory treatment by Steger.  With respect to the first allegation, Plaintiff alleges that he spoke to the on-duty nurse about "conflicting demands and unprofessional threats that Steger had vented."  (AC ¶ 48.)  However, to that point in the narrative arc of Plaintiff's pleadings, Plaintiff alleges no detail concerning the threats Steger is said to have made.  In other words, Plaintiff does not state that any such threats would concern a violation of law such as being fired or having an adverse action taken against him as a result of his race or gender.

Accordingly, when reporting such treatment to the on-duty nurse, Plaintiff was at best reporting Steger's "unprofessional conduct," *Roman-Malone*, 2013 WL 3835117, at *8 (dismissing retaliation claims where the complaints concerned "'unprofessional conduct' [that] is not statutorily prohibited"), because Plaintiff would have no "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Quinn*, 159 F.3d at 769.

Plaintiff's interaction with Yoakum, however, suffers from no such infirmity. Plaintiff alleges that he "spoke to Yoakum *about* [Steger's] threats, hostility, profanity, and misconduct." (AC ¶ 51 (emphasis added).) By alleging that Plaintiff's discussion with Yoakum "about" all of the threats Steger made to *that* point, (*id.*), this would have included Steger's threat that she would "get him fired," made during Plaintiff's conversation with the non-party nurse, (*id.* ¶ 49). "[D]rawing all reasonable inferences in favor of the plaintiff," *Daniel*, 992 F. Supp. 2d at 304 n.1, Plaintiff would have a good-faith, reasonable, and objective belief that Steger's actions— namely seeking to get him fired following making a series of racially-charged statements— constituted a violation of discrimination law. In so doing, the Court finds that Plaintiff has plausibly alleged that he engaged in protected activity in the form of his informal complaint to Yoakum. *See Cruz*, 202 F.3d at 566 (stating that "protected activities" include "making complaints to management" regarding violations of law (quotation marks omitted)).

The Court cannot find similarly with respect to Plaintiff's remaining communications. For a complaint to constitute a protected activity, "a plaintiff must [make the complaint] in 'sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race, gender, or national origin.'" *Harris v. Off. of New York State Comptroller*, No. 20-CV-8827, 2022 WL 814289, at *17 (S.D.N.Y. Mar. 17, 2022) (quoting *Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 280–81 (E.D.N.Y.

2013)).  In other words, "ambiguous complaints that do not make the employer aware of alleged *discriminatory* misconduct do not constitute protected activity."  *Int'l Healthcare Exch., Inc v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (emphasis added) (citation omitted).

Plaintiff alleges no facts that would satisfy this requirement regarding his complaint to Human Resources or conversations related thereto.  With respect to his formal complaint, Plaintiff alleges only that he "filed a complaint with the Human Resources Department" at WCHCC "*[b]ecause of the October 14, 2019 incident . . . .*"  (AC ¶ 53 (emphasis added).) Plaintiff does not state what was said or included in this formal complaint, nor was the complaint quoted or attached to the pleadings.  (*See generally id.*)  So while "there are no magic words that must be used when complaining about a supervisor," *Ramos v. City of New York*, No. 96-CV-3787, 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997), it is nonetheless true that "[t]he onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally," *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308–09 (S.D.N.Y. 2009) (citation omitted).  Absent such allegations, the Court cannot conclude that his HR complaint is a protected activity.  *See Harris*, 2022 WL 814289, at *17 (S.D.N.Y. Mar. 17, 2022) (dismissing a claim of retaliation where the plaintiff "failed to allege that he engaged in protected activity" because he "does not allege that he ever explicitly raised the issue of gender discrimination when he complained"); *Ramirez v. Temin & Co., Inc.*, No. 20-CV-6258, 2021 WL 4392303, at *15 (S.D.N.Y. Sept. 24, 2021) (dismissing retaliation claims where the plaintiff failed to allege discriminatory treatment with respect to her complaint to management because the complaint alleged was "not sufficiently specific to constitute a protected activity"); *Cardwell v. Davis Polk*

*& Wardwell LLP*, No. 19-CV-10256, 2021 WL 4434935, at *30 (S.D.N.Y. Sept. 23, 2021)

(finding, on a motion to dismiss, an alleged informal complaint made via email to be "an

ambiguous complaint that does not qualify as protected activity because it was not sufficiently

pointed to put any [d]efendant on notice that [the] [plaintiff] was complaining about

discrimination under federal, state, or city law").  In other words, Plaintiff alleges no facts that

show that this formal complaint made "the employer aware of alleged *discriminatory*

misconduct," *Int'l Healthcare*, 470 F. Supp. 2d at 357 (emphasis added).

For the same reason, subsequent conversations Plaintiff allegedly engaged in with others

regarding his HR complaint similarly fail to plausibly establish that Plaintiff specifically raised

the issue of discriminatory treatment, meaning they cannot be considered protected activity.  *See*

*id.*  Therefore, the Court finds that Plaintiff engaged in only one act of protected activity

sufficient to establish his retaliation claims: his conversation with Yoakum on an unspecified

date.

## ii.  Causal Connection

"A causal connection in retaliation claims can be shown either '(1) indirectly, by showing

that the protected activity was followed closely by discriminatory treatment, or through other

circumstantial evidence such as disparate treatment of fellow employees who engaged in similar

conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by

the defendant.'"  *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d

111, 117 (2d Cir. 2000)).  Plaintiff fails to allege a causal connection under either theory.

Plaintiff alleges no facts to suggest that Plaintiff was fired *because* he complained to

Yoakum.  Indeed, Plaintiff alleges no "connection" between this informal complaint and his

adverse employment action.  *See Soto v. Marist Coll.*, No. 17-CV-7976, 2019 WL 2371713, at

*10 (S.D.N.Y. June 5, 2019) ("A plaintiff must plausibly plead a connection between the act and his engagement in protected activity in order to state a retaliation claim" (citation and quotations omitted)).   Accordingly, Plaintiff fails to allege a direct causal connection between his engagement in protected activities and his subsequent firing.  *See Grimes-Jenkins v. Consol. Edison Co. of N.Y., Inc.*, No. 16-CV-4897, 2017 WL 2258374, at *11 (S.D.N.Y. May 22, 2017) (dismissing retaliation claim because "the plaintiff does not tie the [adverse employment action] to the reporting of any act of discrimination or harassment"), *report and recommendation adopted by* 2017 WL 2709747 (S.D.N.Y. June 22, 2017); *Feliciano v. City of New York*, No. 14-CV-6751, 2015 WL 4393163, at *9 (S.D.N.Y. July 15, 2015) (holding the plaintiff failed to state a retaliation claim because he "d[id] not point to any direct evidence that would show a causal connection between the [protected] comment to [the defendant] and the [adverse employment action]"); *Harris v. NYU Langone Med. Ctr.*, No. 12-CV-454, 2013 WL 3487032, at *19 (S.D.N.Y. July 9, 2013) (dismissing retaliation claim because the complaint "alleges no facts to suggest that [the plaintiff's] activities, protected or not, motivated [the defendant's] decision [to take the adverse employment action against] her"), *report and recommendation adopted as modified on other grounds by* 2013 WL 5425336 (S.D.N.Y. Sept. 27, 2013).

Plaintiff also fails to allege a causal connection between his lone protected activity and his termination via indirect or circumstantial facts, namely the temporal proximity between the protected activity and the adverse employment event.  Courts in the Second Circuit hold that "[t]he causal connection needed for proof of a retaliation claim can be established by indirectly showing that the protected activity was closely followed in time by the adverse action."  *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 262 (S.D.N.Y. 2015) (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268,

273 (2001) (holding that temporal proximity alone may suffice to establish causation where

proximity is "very close" (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th

Cir. 2001))); *Hopkins v. New England Care Emps. Welfare Fund*, 985 F. Supp. 2d 240, 254 (D.

Conn. 2013) (same).

       As Plaintiff correctly observes, the Second Circuit "has not established a specific delay

that defeats an inference of causation," (Pl.'s Mem. 19 (quoting *Garcia v. Yonkers Bd. of Educ.*,

188 F. Supp. 3d 353, 361 (S.D.N.Y. 2016)), but the Second Circuit has discounted an inference

of causation after three months, *see Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir.

1990).  The Second Circuit has similarly affirmed multiple cases emanating from this district

holding similarly, albeit via non-precedential summary order.  *See, e.g.*, *Berrie v. Bd. of Educ. Of*

*the Port Chester-Rye Union Free Sch. Dist.*, 750 F. App'x 41, 49 (2d Cir. 2018) (summary order)

(affirming grant of summary judgment for defendant where purported retaliation occurred

months after, yet "[t]emporal proximity alone is generally insufficient after about three months"

(citing *Hollander*, 895 F.2d at 85)); *Massaro v. Bd. of Educ. of City Sch. Dist. of City of New*

*York*, No. 17-CV-8191, 2021 WL 184364, at \*6 (S.D.N.Y. Jan. 19, 2021) (adopting the 3-month

standard), *aff'd sub nom. Massaro v. N.Y.C. Dep't of Educ.*, No. 21-266-CV, 2022 WL 1788203,

at \*2 (2d Cir. June 2, 2022) (summary order) (affirming the same 3-month standard while

quoting *Berrie*).  Accordingly, district courts within the Second Circuit have similarly adopted

this precept.  *See Rettino v. N.Y.C. Dep't of Educ.*, No. 19-CV-5326, 2021 WL 2987113, at \*5

(S.D.N.Y. July 15, 2021) (adopting the same 3-month standard while quoting *Berrie*); *Feliciano*,

2015 WL 4393163, at \*10 (collecting cases requiring adverse action to occur within

approximately two months of the plaintiff's protected activity); *Williams City of New York*, No.

11-CV-9679, 2012 WL 3245448, at \* 11 (S.D.N.Y. Aug. 8, 2012) ("The passage of even two or

three months is sufficient to negate any inference of causation when no other basis to infer retaliation is alleged."). And where the Second Circuit or courts therein have held that a greater-than-three-month delay is permissible, "other supporting factual allegations" regarding the connection between the complaint and the adverse action were required to survive a motion to dismiss. *Siclari v. N.Y.C. Dep't of Educ.*, No. 19-CV-7611, 2020 WL 7028870, at *9 (S.D.N.Y. Nov. 30, 2020) (citing *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013)).

Ultimately, however, this dividing line likely proves unnecessary. Just as courts have dismissed claims of temporal proximity due to the duration of temporal delay, courts have also dismissed claims where a plaintiff fails to allege any facts from which the length of delay may be gleaned. *See Rogers v. Fashion Inst. of Tech.*, No. 14-CV-6420, 2016 WL 889590, at *7–8 (S.D.N.Y. Feb. 26, 2016) (finding that the plaintiff failed to state a retaliation claim where the plaintiff had "fail[ed] to allege sufficient facts regarding the timing of his complaints to establish causation"); *Jones v. Target Corp.*, No. 15-CV-4672, 2016 WL 50779, at *9 (E.D.N.Y. Jan. 4, 2016) (dismissing the plaintiff's retaliation claim because the complaint "fail[ed] to identify any facts regarding when the alleged events . . . occurred"); *Feliciano*, 2015 WL 4393163, at *9 (dismissing a retaliation claim where the complaint failed to provide the dates of any of the relevant events in question, thereby inhibiting a finding of causality).

Of the six potential protected activities, Plaintiff only alleges specific dates (or even approximations) for three, having specifically excluded—by his own volition, as the master of the pleadings—"[t]he exact date[] of his conversations with Yoakum . . . ." (Pl.'s Mem. 21.) "Given the absence of any factual allegations concerning when th[is] complaint[] might have been made, Plaintiff has failed to establish a causal connection." *Ramirez v. NYP Holdings, Inc.*, No. 18-CV-12058, 2020 WL 470011, at *10 (S.D.N.Y. Jan. 29, 2020) (citations omitted).

To the extent the Court could draw any inferences as to when this occurred, though, Plaintiff's allegations *still* fall short.  Plaintiff makes this undated allegation, (*see* AC ¶ 51), in between his allegation regarding his dust-up with Steger, (*see id.* ¶¶ 42–50), and his allegation of filing a complaint with HR, (*see id.* ¶ 53).  Therefore, the Court could infer that this conversation occurred, at latest, the day Plaintiff filed the HR complaint, October 14, 2019, four full months before Plaintiff's termination.  But it remains the case that "[a] greater than three[-]month gap, *unsupported by any other allegations showing plausible retaliation*, is insufficient to raise an inference of retaliation" and thereby defeat a Rule 12(b)(6) motion to dismiss.  *McDowell v. N. Shore-Long Island Jewish Health Sys.*, 788 F. Supp. 2d 78, 82 (E.D.N.Y. 2011) (emphasis added).

Because Plaintiff has not plausibly alleged either direct or indirect causality between Plaintiff's protected activity and the adverse event, Plaintiff has failed to establish the necessary elements of a retaliation claim.  Defendants' Motion regarding all retaliation claims is therefore granted.  *See Ramirez*, 2020 WL 470011, at *10 (dismissing a retaliation claim where the plaintiff "failed to establish a causal connection" between the protected activity and the adverse event where the plaintiff "does not point to any direct evidence of retaliatory animus" and failed to allege and facts "concerning when" the protected activity "might have been [undertaken]"); *Feliciano*, 2015 WL 4393163, at *9 (granting motion to dismiss on a retaliation claim where the plaintiff "does not point to any direct evidence that would show a causal connection" nor did the plaintiff "provide the date of any of the times [of the adverse events]," thereby rendering it

"impossible for the [c]ourt to determine the temporal proximity of the alleged retaliatory acts to the protected conduct").[28]

### 3.  FMLA Interference Claim

Plaintiff alleges that after his accident, he "suffered severe pain," which required "diagnostic imaging" and several days off of work, both to attend medical appointments and due to the "pain's severity."  (AC ¶¶ 64–67.)  Plaintiff further alleges that he brought in doctors' notes and requested to speak with Human Resources "to plan his FMLA leave," but "Yoakum concluded that even asking for leave was 'insubordinate.'"  (*Id.* ¶¶ 11–12.)  Plaintiff alleges that because of Yoakum's "interference," he was deterred from speaking to Human Resources and therefore never filed an FMLA claim.  (*Id.* ¶ 13.)  Broadly speaking, Defendants argue that Plaintiff failed to allege sufficient facts supporting the claim.  (Defs.' Mem. 21–22; Defs.' Reply Mem. 9–10.)  The Court once more evaluates Defendants' arguments.

### a.  Applicable Law

To establish a claim of FMLA interference, a plaintiff must establish that: (1) "[he] is an eligible employee under the FMLA"; (2) the defendant is "an employer as defined by the FMLA"; (3) the plaintiff "was entitled to take leave under the FMLA;" (4) the plaintiff gave the employer notice of his or her intention to take leave; and (5) the plaintiff "was denied benefits to which [he] was entitled under the FMLA."  *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016); *see also Patel v. NYU Langone Hosps.*, No. 20-112, 2021 WL 4852426, at 3*

---

[28] The Parties spend considerable ink considering the timeliness of Plaintiff's EEOC filing and whether such administrative remedies were exhausted.  (*See* Defs.' Mem. 8–9, 17; Pl.'s Mem. 5–7; Defs.' Reply Mem. 4–6.)  Because the Court finds all of Plaintiff's Title VII claims lacking on the merits, however, the Court need not discuss, let alone adjudicate, whether Plaintiff's EEOC filing was timely.

(2d Cir. Oct. 19, 2021) (summary order) (applying the same five-factor test); *Boncoeur*, 2022 WL 845770, at *12 (same).

Defendants concede the first two elements.  (*See* Defs.' Mem. 21.)  Defendants argue that Plaintiff has failed to assert facts that support elements three, four, and five; that is, whether Plaintiff was entitled to FMLA leave, whether Plaintiff gave WCHCC notice, and whether Defendants actually denied benefits to which he was entitled by the FMLA.  (*Id.* at 21–22.)[29]

### b.  Application

Plaintiff fails to plausibly allege that he was entitled to FMLA leave.  An eligible employee is entitled to FMLA leave, inter alia, "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  The FMLA further defines a "serious health condition" as an injury that requires "inpatient care in a hospital, hospice, or residential care facility" or "continuing treatment by a health care provider."  *Id.* § 2611(11).  "Courts in this district have relied on Department of Labor ["DOL"] regulations to determine whether a plaintiff's injury satisfies the FMLA's definition of a 'serious health condition.'"  *Banks v. McGlynn, Hays & Co.*, No. 21-CV-679, 2022 WL 845752, at *2 (S.D.N.Y. Mar. 22, 2022) (citations omitted).  Under DOL regulations, there are several independent bases that can satisfy this definition, but only two are relevant in this Action:

---

[29] Defendants argue that Plaintiff's "Amended Complaint does not allege that Steger or Osorio violated or otherwise interfered with Plaintiff's rights under the FMLA," and therefore Plaintiff's FMLA claim against these Individual Defendants must be dismissed.  (Defs.' Mem. 22.)  The Court agrees.  Plaintiff's Opposition fails to address this issue, (*see* Pl.'s Mem. 10–12), and Plaintiff pleads no facts in his Amended Complaint involving Steger or Osorio as it relates to Plaintiff's attempt to exercise his FMLA leave, (*see* AC ¶¶ 11–13, 65–68, 94–100).  Accordingly, the Court treats these claims as abandoned as to Steger and Osorio.  *See, e.g.*, *Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313, 328 (S.D.N.Y. 2018) ("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim.").

(a) Incapacity and treatment.  A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

> (1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

> (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

> (3) The requirement in paragraphs (a)(1) and (2) of this section for treatment by a health care provider means an in-person visit to a health care provider.  The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity.

> (4) Whether additional treatment visits or a regimen of continuing treatment is necessary within the 30–day period shall be determined by the health care provider.

> (5) The term extenuating circumstances in paragraph (a)(1) of this section means circumstances beyond the employee's control that prevent the follow-up visit from occurring as planned by the health care provider. Whether a given set of circumstances are extenuating depends on the facts. For example, extenuating circumstances exist if a health care provider determines that a second in-person visit is needed within the 30–day period, but the health care provider does not have any available appointments during that time period.

. . .

(c) Chronic conditions. Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:

> (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;

> (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

> (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

> (iii) Any period of incapacity or treatment for such incapacity ... due to a chronic serious health condition. A chronic serious health condition is one which:

41

> (A) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;
>
> (B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
>
> (C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.115(a)–(c).

Plaintiff's allegations do not sound in "chronic" pain or symptomatology, nor do they exhibit the hallmarks of such afflictions.  (*See generally* AC.)  Specifically, there is no discussion in the Amended Complaint that Plaintiff's pain required "*periodic* visits (defined as at least twice a year) for treatment . . . over an extended period of time (including *recurring episodes* of a single underlying condition)."  29 C.F.R. § 825.115(c) (emphases added).  Rather, the Amended Complaint speaks to a continuous incapacity under sub-section (a).

Plaintiff alleges that his inability to work prompted him to "apply for short-term disability until he could recover."  (AC ¶ 70.)  New York short-term disability benefits begin on "the eighth day of disability and thereafter during the continuance of disability."  N.Y. Workers' Comp. Law § 204(1).[30]  If Plaintiff alleges that he sought short-term disability benefits, which requires missing seven days of work, the Court could draw the reasonable inference that Plaintiff has alleged he was disabled for at least consecutive three days, as is required under the FMLA.  *See* 29 C.F.R. § 825.115(a).

---

[30] "The Court may take judicial notice of state statutes."  *Barkai v. Mendez*, No. 21-CV-4050, 2022 WL 4357923, at *13 (S.D.N.Y. Sept. 20, 2022) (citation omitted); *see also Wendel v. New York*, 500 F. Supp. 2d 172, 174 n.1 (E.D.N.Y. 2007) ("The Court takes judicial notice of the New York State statutes discussed herein." (citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998)).

Notwithstanding this inference, upon closer examination of the regulation, Plaintiff's

pleadings offer insufficient detail to satisfy this allegation.  In addition to pleading "[a] period of

incapacity of more than three consecutive . . . days," a plaintiff must *also* plead a separate and

distinct "subsequent treatment or period of incapacity relating to the same condition[] that also

involves" two or more additional treatments within the first day of incapacity, *or* at least one

treatment that "results in a regimen of continuing treatment."  *Id.*  No such allegations exist.

Plaintiff only alleges in general terms that Plaintiff: "suffered severe pain"; "would have to miss

some work"; "made every attempt to be at work but had no choice to take from his bank of sick

days"; and "always provided a doctor's note or similar to justify these sick days."  (AC ¶¶ 64, 65,

66, 67.)

Once again, the Court "may not 'invent factual allegations that [the plaintiff] has not

pled.'"  *Wilson*, 2022 WL 1138073, at *10 (quoting *Chavis*, 618 F.3d at 170).  Plaintiff's

omissions of key dates and details render the Court unable to conclude that he has "nudged [his]

claim[] across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, as it pertains to

the treatment requirements for a "serious health condition" having required "continu[ed]

treatment by a health care provider," 29 U.S.C. § 2611(11).[31]

### III. Conclusion

For the reasons explained herein, Defendants' Motion To Dismiss is granted.  Because

this is the first adjudication of Plaintiff's claims on the merits, this dismissal is without prejudice.

Plaintiff may file a second amended complaint within 30 days of the date of this Opinion &

---

[31] Having found that Plaintiff failed to assert plausible violations of the FMLA in light of the insufficient pleadings regarding Plaintiff's entitlement to FMLA leave, the Court need not discuss the remaining elements required to sustain an FMLA interference claim.

Order.  Failure to properly and timely amend will likely result in dismissal of the claims against

Plaintiff with prejudice.

The Clerk of Court is respectfully directed to terminate the pending Motion.  (Dkt. No.

31.)

SO ORDERED.

DATED:      September 27, 2022
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE