UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GARFIELD WILLIAMS,

                                    Plaintiff,

        v.

WESTCHESTER MEDICAL CENTER
HEALTH NETWORK *et al.*,

                                    Defendant.

No. 21-CV-3746 (KMK)

OPINION & ORDER

Appearances:

Garfield Williams
Bronx, NY
*Pro Se Plaintiff*

Daniel David Schudroff, Esq.
Leo Ernst, Esq.
Jackson Lewis P.C.
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Garfield Williams ("Plaintiff"), proceeding pro se, brings this lawsuit, pursuant to 42

U.S.C. § 1981 ("Section 1981"), 42 U.S.C. § 2000e (Title VII of the Civil Rights Act or "Title

VII"), 29 U.S.C. §§ 2601 *et seq*. (Family and Medical Leave Act or "FMLA"), New York State

Human Rights Law ("NYSHRL"), and N.Y. Lab. Law §§ 196-B, 198, 741, against Westchester

County Health Care Corporation ("WCHCC"), Marcela Steger ("Steger"), Jason Yoakum

("Yoakum"), and Kenneth Osorio ("Osorio"; with Steger and Yoakum, "Individual Defendants";

collectively, "Defendants"), alleging discrimination and retaliation on the basis of race, in

violation of Section 1981, Title VII, and various provisions of New York state law, as well as

interference with his leave under the FMLA. (*See generally* Second Am. Compl. ("SAC") (Dkt. No. 61).)[1, 2] Before the Court is Defendants' Motion to Dismiss the SAC in its entirety (the "Motion"). (*See* Not. of Mot. (Dkt. No. 64).) For the following reasons, Defendants' Motion is granted in full.

I. Background

A. Factual Background

Unless otherwise stated, the following facts are drawn from Plaintiff's SAC and are assumed true for the purpose of resolving the instant Motion. *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

Plaintiff is a Patient Care Technician ("PCT"). (SAC ¶ 11.) Plaintiff trained for seven years at the Young Adult Institute in the Bronx and has also "earned several certifications in providing medical care to special needs children and adults." (*Id.*) In his role as a PCT, Plaintiff assists nurses and doctors and "prepares for operations." (*Id.*) Specifically, Plaintiff's jobs included setting up equipment, sterilizing and drying surgical tools, moving patients between rooms, sanitizing each room, cleaning up after surgeries, and assisting doctors and nurses in any other task that requires assistance. (*Id.* ¶ 17.) In addition, one of the jobs of a PCT is to ensure

---

[1] In his Complaint, Plaintiff mistakenly calls WCHCC by its trade name, Westchester Medical Center Health Network. (*See generally* SAC; *see also* Defs.' Mem. at 1 (highlighting this error).) However, the Court refers to this Defendant by its proper name, WCHCC, as indicated by Defendants.

[2] When Plaintiff initiated this case, he was represented by counsel. However, on May 26, 2023, Plaintiff filed a letter with this Court, explaining that his attorney passed away unexpectedly and after an unsuccessful attempt at obtaining new counsel, Plaintiff would be proceeding pro se. (*See* Dkt. No. 59.)

all sponges and other "foreign objects" are accounted for such that patients do not leave "the hospital with foreign objects in their inner cavities." (*Id.* ¶ 28.)

At the time of the events giving rise to this Action, Plaintiff was employed by WCHCC as a PCT and worked in an operating room in its Hawthorne Facility. (*Id.* ¶ 12.)[3]

Steger is a Registered Nurse for WCHCC. (*Id.* ¶ 3.) Yoakum is employed by WCHCC and enjoys the title of "Director of Operation Room." (*Id.* ¶ 4.) Osorio is the Director of Clinical Operations, and it also employed by WCHCC." (*Id.* ¶ 5.)

1. The October 14, 2019 Incident

On October 14, 2019, Plaintiff was cleaning an operating room alongside two other PCTs after an operation. (*Id.* ¶ 31.) Plaintiff alleges that he was collecting the trash and medical waste and putting it "into specially marked trash containers." (*Id.*) Plaintiff placed the trash containers in the corner of the room, but pursuant to the direction of a (non-defendant) nurse, did not throw the bags of trash out, as she had just completed surgery and still needed to account for the surgical sponges. (*Id.* ¶ 32.)

When Steger arrived in the operating room, she inquired about the bloody bag. (*Id.* ¶ 33.) Plaintiff told her that, as instructed, he cleaned up room 102 and put all the hazardous items into designated bags and kept them there so Steger could oversee the recount of each sponge. (*Id.*) However, Steger "demanded Plaintiff go through the trash, find and remove *her* sponges from the bags," and then "demeaned him by analogizing him to a janitor." (*Id.* ¶ 35 (emphasis in original).) Moreover, Plaintiff alleges that, while he did not say so to Steger, "it would have been impossible to distinguish *her* bloody sponges from anyone else's" and that undertaking

[3] Plaintiff claims that in the weeks leading up to his firing, he had been considered for a promotion to "Anesthesia Technician." (*Id.* ¶ 14.) This new position would have included a pay raise and substantial more responsibilities in the operating room. (*Id.*)

such a request could have resulted in a miscount. (*Id.*) Despite Plaintiff's explanation of the other nurse's instruction, even as Plaintiff tried to satisfy her demand, Steger allegedly "made threats" against Plaintiff, including "us[ing] profanity." (*Id.* ¶ 36.)

Following this exchange, Plaintiff alleges that he "went to the front desk where a Patient-Center Care Nurse sits" and tried to explain the incident that occurred in the operating room to Vinny Acevedo, a colleague that was on duty at the desk at the time. (*Id.* ¶ 39.) Steger then "approached and stopped the conversation, cursing and pointing in Plaintiff's face, threatening to get him fired, and demanding that Plaintiff do something in conflict with the directions of the earlier nurse." (*Id.* ¶ 40.) Plaintiff stated that he then tried to walk away, "but Steger continued her barrage of threats, hostility, and profanity in front of several employees." (*Id.* ¶ 41.)[4]

2. Reactions to the October 14, 2019 Incident

At some time after Plaintiff's conversation at the front desk with Acevedo, Plaintiff spoke to Yoakum "about the threats, hostility, profanity, and misconduct" of Steger. (*Id.* ¶ 42.) Plaintiff alleges that as he attempted to explain the situation to Yoakum, Steger made comments about how "Plaintiff's being a male disqualified him from feeling intimidated or afraid," and the fact that their "disparity in size . . . spoke for itself." (*Id.* ¶ 43.)[5] In addition, Plaintiff asserts that after Plaintiff attempted to complain to Yoakum about Steger's behavior, Steger "said words to the effect of '[o]h, big man. Come outside. Are you afraid of little old me?'" and called Plaintiff "'Sonny,' a quiet racial slur akin to 'boy.'" (*Id.* ¶ 46.)

---

[4] The SAC does not articulate what, precisely, Steger said during this exchange.

[5] Plaintiff avers that Steger "is a diminutive woman, in the range of 100–125 pounds." (*Id.* ¶ 43.) By contrast, Plaintiff alleges he is "genetically tall with a masculine build." (*Id.* ¶ 44.)

On October 16, 2019, Plaintiff filed a complaint with WCHCC's Human Resources Department ("HR") regarding the October 14 Incident. (*Id.* ¶ 49.) Plaintiff alleges that while the complaint was pending, rumors "spread throughout the workplace," and Plaintiff "sensed" that the rumors "caused the staff to distance themselves from Plaintiff." (*Id.* ¶¶ 50–51.) Plaintiff stated that these rumors, dovetailing the October 14 Incident, "caused him to lose confidence in himself and his work performance." (*Id.* ¶ 51.) Moreover, while Plaintiff's complaint was pending, "[WCHCC] knowingly continued to schedule Plaintiff to work alongside [Steger]." (*Id.* ¶ 52.)

On October 23, 2019, Plaintiff was scheduled to work with Steger in the Ambulatory Care Pavilion. (*Id.* ¶ 53.) When Steger arrived, Acevedo immediately advised Plaintiff to call one of Plaintiff's supervisors, Eddie Amponsah. (*Id.*) Amponsah was in charge of the PCTs and Plaintiff's direct supervisor. (*Id.*) Plaintiff alleges that Amponsah rushed over and explained that Steger was never supposed to be in the Ambulatory Care Pavilion, but to clear up the situation, he was going to move Plaintiff to the main OR and another one of Plaintiff's colleagues to the Ambulatory Care Pavilion. (*Id.*) Plaintiff contends that he considered this to be a "demotion, and a disproportionately negative outcome." (*Id.* ¶ 54.)

Plaintiff alleges that this incident prompted him to email HR "advising [HR] that he found it impossible to work with Steger." (*Id.* ¶ 55.) Plaintiff claims that he "never received a response" to this email from HR and "after weeks of no response from [WCHCC], [Plaintiff] visited the [HR] department" but was turned away. (*Id.* ¶¶ 56–58.) Plaintiff also alleges that he further asked other managers if they had heard anything regarding his complaint but was told only that "nothing would happen to Steger because it was a female world." (*Id.* ¶ 59 (alteration adopted).)

Thereafter, Plaintiff asserts that his work life and career development was drastically affected. (*Id.* ¶ 60.) Specifically, his schedule was disrupted and replaced because he was forced to move assignments, operating rooms, and switch schedules with other PCTs at a moment's notice in order to accommodate Steger's schedule and presence in the Ambulatory Care Pavilion. (*Id.*)

<u>3. The December 15, 2019 Car Accident and Subsequent Events</u>

On December 15, 2019, Plaintiff was involved in a car accident, which caused him several injuries and severe pain. (*Id.* ¶ 66.) Plaintiff was then arrested in association with the accident and transported to a medical center for evaluation. (*Id.* ¶ 67.)[6] Plaintiff asserts he missed work at WCHCC on December 15 due to injuries sustained during the car accident. (*Id.* ¶ 68.) Plaintiff states that he immediately reported the incident to this Supervisors and HR, including Yoakum and Osorio. (*Id.*) In the following days, Plaintiff noticed an increase in the pain's severity. (*Id.* ¶ 69.) Plaintiff "made every attempt to be at work but had no choice [but] to take from his bank of sick days" due to the pain he suffered from the car accident. (*Id.*)[7] Plaintiff asserts that he "always provided a doctor's note" or an equivalent thereof to justify his sick days. (*Id.* ¶ 123.) Moreover, Plaintiff claims that he "made it clear to his supervisors, including [] Yoakum and [] Osorio, that he was still dealing with the effects of the crash, and that he had yet to recover." (*Id.* ¶ 69.)

[6] Plaintiff contends that the arrest was documented (B19649648-N) but was never docketed in a criminal court. (*Id.* ¶ 67 n.5.) Further, he states that he currently has a wrongful arrest case pending in this District, No. 20-CV-5995 (S.D.N.Y.). (*Id.*)

[7] Specifically, Plaintiff contends that from December 15, 2019, to the beginning of February 2020, Plaintiff missed numerous days of work, including a stretch of seven days between Wednesday January 29, 2020 and Saturday February 8, 2020, attempting to recover from the accident, and due to discomfort and pain. (*Id.* ¶ 70 (internal citation omitted).)

Plaintiff claims that his medical issues persisted from the time of the accident to the time of his firing. (*Id.* ¶ 72.) In addition, from February 2020 to March 2020, Plaintiff sought medical care through various appointments. (*See id.* ¶¶ 71–86.)[8] During this period, Plaintiff contends, he always kept his supervisors aware of the reasons for his sick day usage and provided documentation to his employer about his medical condition, including doctors' notes. (*Id.* ¶ 87.) In addition, Plaintiff alleges that he directly spoke to his supervisors, including Yoakum and Osorio, explaining to them that he had been in a car accident, and that due to that car accident he was experiencing serious pain to his neck and back, which was making it difficult for him to work, and as a result, he was using his sick time and vacation time to recover. (*Id.* ¶ 88.)

Plaintiff claims that despite his pain and discomfort from his back and neck, he returned to work at WCHCC on February 11, 2020. (*Id.* ¶ 94.) On the same day, Plaintiff states that he discussed his situation with Acevedo, explaining that he was still feeling serious pain due to the accident. (*Id.* ¶ 95.) Plaintiff alleges that Acevedo advised Plaintiff to apply for FMLA – Short Term Disability, which Plaintiff attempted to do that day. (*Id.*) However, Plaintiff claims that before he could finish filling the FLMA forms out and filing them with HR, Plaintiff was approached by Yoakum, who said "you think you leaving, (referring to FMLA application) let me talk to you at 2:30PM in Kenneth Osorio Office." (*Id.* ¶¶ 97, 99.) Plaintiff believed that Yoakum's request was an attempt to intimidate Plaintiff into not applying for FMLA. (*Id.* ¶ 101.)

[8] Plaintiff states that one of his appointments scheduled in April 2020 was cancelled due to COVID restrictions, and a new appointment took almost one year to reschedule. (*Id.* ¶ 86.)

The next day, February 12, 2020, Plaintiff states that Yoakum approached Plaintiff and stated, in front of several of Plaintiff's peers, "you never came to [Osorio's] [o]ffice, you are stealing time, you are going to be fired." (*Id.* ¶ 104.) During this exchange, Plaintiff claims that Yoakum was making the threats to Plaintiff, indicating that Plaintiff was going to be fired for attempting to apply for FMLA. (*Id.* ¶ 106.) Shortly thereafter, Osorio and Sherri Witkins, who was Director of Nursing Perioperative Services, arrived and Plaintiff explained to them that he was being harassed and wrongly accused by Yoakum, and that he would prefer to speak to HR because Yoakum was attempting to interfere with Plaintiff's FMLA application and his previous complaints to them about harassment were brushed off. (*Id.* ¶¶ 109, 111.) Plaintiff alleges that when he did try to explain the issue to Osorio and Witkins, Osorio looked at Witkins and Amponsah and said "ooo, this again," which Plaintiff understood to be a reference to Plaintiff's previous complaints about a hostile work environment involving Steger. (*Id.* ¶ 112.)

Plaintiff claims that, without questioning Plaintiff or any of the other witnesses, or looking at surveillance tape, Osorio "sided with" Yoakum, and "threw" Plaintiff out of the building, before Plaintiff could file his completed FMLA paperwork. (*Id.* ¶¶ 113–14.) Plaintiff alleges that he later learned that Osorio and Yoakum reported to HR that Plaintiff had taken unexcused days off and had threatened Yoakum during the February 12, 2020 interaction, which Plaintiff alleges is categorically false. (*Id.* ¶ 116.)

After he left the building, Plaintiff states that he called HR to get an explanation of Yoakum's accusations and to make sure that his FMLA application would be processed. (*Id.* ¶ 120.) Plaintiff claims that he was told that HR could not talk to him about it and that he had to wait until he received a letter in the mail. (*Id.* ¶ 121.)

The next day, Plaintiff received a letter that stated: "[b]ased on your prior record of unscheduled absenteeism and your insubordinate and inappropriate actions displayed on February 11, 2020 and February 12, 2020, please be advised that your employment as a Patient Care Technician at Westchester Medical Center, Advanced Physicians Services, is terminated effective close of business, February 12, 2020." (*Id.* ¶ 122 (internal citation omitted).) Plaintiff asserts, following his termination, WCHCC, Yoakum, and Osorio "post[ed] a Wanted Poster" at WCHCC, which alleged that Plaintiff had made threats to staff. (*Id.* ¶ 129.)

Plaintiff also contends that Defendants did not cooperate with Plaintiff regarding his no fault Progressive claim for lost wages. (*Id.* ¶ 150.) Specifically, he claims that WCHCC refused to verify his employment with the no-fault insurance carrier, even though the verification would have provided Plaintiff with lost wages and allowed him to pay medical bills related to his accident. (*Id.* ¶ 151.)

Following these incidents, Plaintiff filed an Equal Employment Opportunity Commission (EEOC) Charge against WCHCC. (*Id.* ¶ 157–58.) Plaintiff was issued a Notice of Right to Sue on January 27, 2021. (*Id.* ¶ 159.)

B. Procedural History

Plaintiff filed his Initial Complaint on April 27, 2021. (Dkt. No. 1.) On June 15, 2021, Plaintiff filed a letter seeking leave to file an Amended Complaint, ("FAC") (Dkt. No. 15), which the Court granted on July 27, 2021, (Dkt. No. 19). Plaintiff filed the FAC on August 3, 2021. (Dkt. No. 24.) On October 20, 2021, Defendants filed a Motion to Dismiss the FAC. (Dkt No. 31.)

On September 27, 2022, the Court issued its Opinion and Order ("Opinion"), granting Defendants' Motion to Dismiss without prejudice. (Dkt. No. 41.) The Court dismissed

Plaintiff's duplicative Title VII sex discrimination claim (Count 11); New York Sick Leave Law and contractual claims as abandoned (Counts 8 and 12); and New York Labor Law § 741 claim as withdrawn (Count 9).  *See Williams v. Westchester Med. Ctr. Health Network*, No. 21-CV-3746, 2022 WL 4485298, at *5 n.16 (S.D.N.Y. Sept. 27, 2022).  In addition, the Court dismissed Plaintiff's (1) race and sex discrimination claims under Section 1981, Title VII and the NYSHRL; (2) retaliation claims under Title VII and the NYSHRL; and (3) FMLA claim, finding that Plaintiff failed to adequately plead each of his claims.  (*See id.*)

Following an extension that this Court granted, Plaintiff filed the SAC on June 30, 2023. (Dkt. No. 61.)  On August 14, 2023, Defendants filed their Motion to Dismiss the SAC and their accompanying papers.  (Not. of Mot.; Schudroff Decl.; Defs.' Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 67).)  Plaintiff file his opposition papers on September 14, 2023. (Pl.'s Mem. of Law in Opp. to Mot. ("Pl.'s Opp.") (Dkt. No. 69).)  Defendants filed their reply papers on September 28, 2023.  (Defs.' Reply Mem. of Law in Supp. of Mot. ("Defs.' Reply Mem.") (Dkt. No. 70); Reply Decl. of Daniel D. Schudroff in Supp. of Defs.' Mot. ("Schudroff Repy Decl.") (Dkt. No. 71).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration adopted) (internal quotation marks and citation omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-

harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration adopted) (internal quotation marks and citation omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570. However, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" (alteration adopted) (internal quotation marks and citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Protection Resources, Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule

12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).  But when a plaintiff proceeds pro se, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal quotation marks and citation omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted). Moreover, where, as here, a plaintiff proceeds pro se, the Court must "construe[ ] [his] [complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (internal quotation marks and citation omitted).  Notwithstanding a standard of review comparatively more lenient and favorable to pro se litigants, such treatment "does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks and citation omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics omitted) (internal quotation marks and citation omitted)).

    B.  Analysis

    Plaintiff's SAC, like the FAC, includes twelve causes of action against all Defendants. (*See* SAC ¶ 161–229.)  However, Counts 7 and 11 state identical claims of sex discrimination

under Title VII against all Defendants, (*compare* SAC ¶¶ 194–199, *with id.* ¶¶ 214–216),

therefore, the Court disregards Count 11 as duplicative.  Additionally, Plaintiff voluntarily

withdrew Count 8 regarding violations of New York Sick Leave Law, Count 9 as to a violation

of New York Labor Law § 741, and Count 12 with regard to breach of contract, (*see* Pl.'s Opp.

at 3), therefore, the Court dismisses these claims.

      The Plaintiff has eight remaining claims, all of which Defendants move to dismiss for

various reasons.  First, Defendants argue that the Court correctly dismissed Plaintiff's Title VII

and NYSHRL race and sex discrimination claims and Section 1983 race discrimination claim,

because Plaintiff failed to plausibly allege that he suffered an adverse employment action arising

under an inference of discrimination, and the SAC fails to provide any additional allegations to

save these claims.  (Defs.' Mem. at 1.)  Defendants also contend that Plaintiff's NYSHRL race

and sex discrimination claims are defective as against WCHCC because Plaintiff failed to timely

serve a requisite notice of claim.  (*Id.*)  Second, Defendants argue that Plaintiff's Title VII and

NYSHRL retaliation claims must be dismissed because they are untimely.  (*Id.*)  Additionally,

Defendants contend that, on the merits, these claims are defective against all Defendants because

they are predicated exclusively upon speculative assertions.  (*Id.* at 1–2.)  Moreover, even

assuming Plaintiff engaged in protected activity, the adverse employment actions he allegedly

suffered were too attenuated in time to demonstrate the requisite causal connection to establish

cognizable causes of action.  (*Id.* at 2.)  Finally, Defendants maintain that Plaintiff's FMLA

interference claim is defectively pled in that the SAC fails to satisfactorily allege that Plaintiff

was entitled to FMLA leave, provided his employer with notice of his intention to take leave, and

that he was denied benefits to which he was entitled.  (*Id.*)

The Court addresses these arguments only to the extent necessary for deciding the instant Motions.

1. Race and Sex Discrimination Under Section 1981, Title VII, and the NYSHRL

In its previous Opinion regarding the FAC, the Court dismissed Plaintiff's race and sex discrimination claims. *See Williams*, 2022 WL 4485298 at *7–14. Plaintiff's race and sex discrimination claims were dismissed because the Court concluded that Plaintiff failed to plausibly allege an inference of discrimination to survive dismissal. *See id.* at *10–14.

As explained in its prior Opinion, with regard to whether "Plaintiff has adequately alleged 'an inference of discrimination,'" *id.* at *7 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)), "a plaintiff need only give plausible support to a minimal inference of a discriminatory motivation," *id.* (emphasis omitted) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015)). "Nevertheless, 'a discrimination complaint must still at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." *Id.* (alterations adopted) (quoting *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014)). "A showing of an 'inference of discriminatory motivation may be supported directly, such as by statements that an adverse employment action was related to the plaintiff's protected class, or indirectly by an allegation that the plaintiff was treated different from and less favorably than similarly situated peers.'" *Id.* (alterations adopted) (quoting *Roache v. Long Island Railroad*, 487 F. Supp. 3d. 154, 172 (E.D.N.Y. 2020)). "Clearing this low pleading threshold entitles the plaintiff to the temporary presumption of *McDonnell Douglas* until the defendant furnishes its asserted reasons for its action against the plaintiff, the evaluation of which is more appropriately considered at summary judgment or at trial." *Id.* (internal quotation marks and citations omitted). "Alternatively, 'the

plaintiff also may create a mosaic of intentional discrimination by identifying bits and pieces of evidence that together give rise to an inference of discrimination." *Id.* (quoting *Stinnett v. Delta Air Lines, Inc.*, 278 F. Supp. 3d 599, 611–12 (E.D.N.Y. 2017)). "Further, 'an inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms,'" *id.* (alteration adopted) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015)), or "terms that degrade plaintiff's gender," *id.* (quoting *McDonough v. N.Y. Dept. of Educ.*, No. 16-CV-4272, 2018 WL 4636834, at *5 (S.D.N.Y. Sept. 27, 2018)).

Here, the Court determines that, despite the Court's earlier dismissal of these claims and clear instructions as to how the claims were deficient, Plaintiff has not sufficiently amended his race and sex discrimination claims to cure his defective pleadings.

As to the race discrimination claims, Plaintiff provides in his SAC many of the same kind of allegations that the Court determined were insufficient in its previous Opinion. Namely, Plaintiff alleges that Steger referred to him as, "big man," "[s]onny," and "little boy", (*id.* ¶ 46), and that a "Wanted Poster" was erected at his place of employment with a false accusation against Plaintiff, (*id.* ¶ 125–30).

The Court in its previous Opinion already determined that the above comments by Steger were insufficient to raise a plausible claim because Plaintiff "failed to allege that a decision-maker who had control over Plaintiff's employment or termination made any discriminatory remarks." *Williams*, 2022 WL 4485298 at *8. The Court noted that other "[c]ourts in this Circuit have repeatedly granted motions to dismiss where the inference of discriminatory intent rests on stray remarks made by those outside of the plaintiff's chain of command." *Id.* (citing *Richards v. City of New York*, No. 19-CV-10697, 2021 WL 4443599, at *7 (S.D.N.Y. Sept. 28,

2021) (dismissing a claim of employment discrimination based on an isolated allegedly discriminatory comment made by a co-worker); *Toney v. Prob. Dep't*, No. 15-CV-561, 2016 WL 859381, at *5–6 (E.D.N.Y. Jan. 28, 2016) (finding that stray race-based comment that "black people live in filth" made by fellow employee with no decision-making authority over plaintiff's position was insufficient to plead discrimination claim), *report & recommendation adopted*, 2016 WL 868206 (E.D.N.Y. Mar. 4, 2016); *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 249 (E.D.N.Y. 2015) (dismissing a plaintiff's discrimination claims where the plaintiff failed to allege that "anyone with control over the decision to fire [the plaintiff] made [the alleged discriminatory] comments")).

As with his previous complaint, Plaintiff does not allege that Steger directly oversaw Plaintiff's employment or termination. (*See generally* FAC; *see also id.* ¶ 37 (alleging only that Steger had "seniority" over Plaintiff and "supervisory authority" in the operating room without saying specifically that she was his supervisor).)  Accordingly, as the Court previously held, because "'it has been settled that stray remarks by a non-decision maker are insufficient to establish a prima facie case of discrimination,' Steger's 'comments have no bearing on the instant case.'"  *Williams*, 2022 WL 4485298 at *8 (alteration adopted) (quoting *Cai v. Wyeth Pharm., Inc.*, No. 09-CV-5333, 2012 WL 933668, at *7 (S.D.N.Y. Mar. 19, 2012)).

Similarly, the Court previously also held that the "Wanted Poster" did not give rise to an inference of discrimination.  *Williams*, 2022 WL 4485298 at *12.  Specifically, the Court noted that the poster does not state that Plaintiff is wanted "but that he is not permitted to access WCHCC unless he is being treated or if he is authorized to enter for a business transaction."  *Id.* (alteration adopted) (internal quotation marks omitted).  Moreover, "the poster states expressly that the reason he is not permitted to enter [is] because he has made threats against the staff."  *Id.*

(internal quotation marks omitted). "[I]n other words, that the poster fails in any way to allude to, hint at, or suggest that Plaintiff's absence of permission is connected to his race[, it] fails to substantiate Plaintiff's assertion that the poster" suggests discrimination against Plaintiff. *Id.* (emphasis omitted). As Plaintiff has not amended his Complaint to include any further allegations concerning the Wanted Poster, the Court's analysis from its previous Opinion as to this issue applies in full and the Court concludes that Plaintiff also fails to allege an inference of discrimination with regard to the Wanted Poster. *See id.*

Plaintiff's sex discrimination allegations fare no better. With regard to sex discrimination, Plaintiff asserts that "Osorio told Plaintiff that nothing would happen because 'it is a female world,'" (*id.* ¶ 196); and "[WCHCC] failed to afford [Plaintiff], a man, the right to be heard on a complaint of workplace harassment by a woman—solely because she is a woman, whereas he is a man," (*id.* ¶ 211). These comments, as previously determined, "lack any nexus to Plaintiff's firing." *Williams*, 2022 WL 4485298 at *13. "In other words, there remains no connection between this comment and the adverse action that befell Plaintiff." *Id.* (citing *Sethi v. Narod*, 12 F. Supp. 3d 505, 543 (E.D.N.Y. 2014) ("Where remarks are unrelated to a decision taken with respect to a plaintiff, they are not probative of discriminatory intent." (collecting cases))). As such, Plaintiff's sex discrimination claim also fails.

Finally, Plaintiff does add allegations concerning the following incident. However, despite the new allegations, Plaintiff still fails to allege a plausible racial or sex discrimination claim. Plaintiff states that that he was scheduled, on October 23, 2019, to work in the Ambulatory Care Pavilion, but was moved by his direct supervisor to the main operating room after the supervisor learned that Steger would be working in the Pavilion. (*See* SAC ¶ 53.) Plaintiff claims that he "considered this a demotion" because he was being moved from the

Pavilion, which was at the "cutting edge of technology and care" and attracted "more interesting, and innovative surgeries and surgeons." (*Id.* ¶ 54.)  As an initial matter, although Plaintiff may have "considered this a demotion," (*id.* ¶ 54), a plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination." *Brodt v. City of New York*, 4 F. Supp. 3d 562, 568 (S.D.N.Y. 2014) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 456 (2d Cir. 1999) (alterations adopted) (internal quotation marks and citation omitted)).  In fact, Plaintiff does not provide any allegations to demonstrate that this was an adverse action, other than his own personal beliefs.  "[W]ithout sufficient facts, even the most sincerely held beliefs [of discrimination] do not comprise a sufficient basis for withstanding a [motion to dismiss]." *Williams v. Wellness Med. Care, P.C.*, No. 11-CV-5566, 2013 WL 5420985, at *6 (S.D.N.Y. Sept. 27, 2013).  Moreover, Plaintiff fails to allege that his move from the Pavilion to the main operating room occurred on the basis of race or gender discrimination, thus dooming this claim. *Durand v. Excelsior Care Grp. LLC*, No. 19-CV-2810, 2020 WL 7246437, at *5 (E.D.N.Y. Dec. 9, 2020) ("Naked assertions of discrimination without any specific allegation of a causal link between the defendants' conduct and the plaintiff's membership in a protected class, are too conclusory to withstand a motion to dismiss." (alterations adopted) (quoting *Gaddy v. Waterfront Comm'n*, No. 13-cv-3322, 2014 WL 4739890, at *5 (S.D.N.Y. Sept. 19, 2014)).

In short, the Court's review of the above allegations, including those that are repeated from the FAC and those that are new, and the rest of the SAC, reveals that Plaintiff has once again failed to provide any factual allegations giving rise to a plausible inference that race or gender was a motivating factor in the alleged discrimination.  *See Smith v. Mercy Med. Ctr.*, No. 16-CV-1814, 2017 WL 3017194, at *5 (E.D.N.Y. June 6, 2017) (dismissing race and national origin discrimination claims where plaintiff failed to allege facts that support her allegation that

"race or national origin were motivating factors behind her termination"). Specifically, Plaintiff's SAC contains the same type of stray and conclusory assertions that this Court previously identified as inadequate to give rise to an inference of race or gender discrimination. *See Williams*, 2022 WL 4485298 at *12, 14; *see also Krulewich v. Covidien, LP*, 498 F. Supp. 3d 566, 574 (S.D.N.Y. 2020) (holding that plaintiffs did not cure their defective pleading, where their amended complaint merely provided additional statements that were conclusory); *Brown v. Annucci*, No. 16-CV-808, 2017 WL 1040416, at *2 (N.D.N.Y. Mar. 16, 2017) (determining that even though plaintiff provided some additional allegations, plaintiff's amended complaint was still deficient because it lacked the necessary facts central to the elements of the claim). Moreover, Plaintiff's allegations concerning his *belief* that race and gender played a role in his firing or other treatment at work remain insufficient to make out a plausible discrimination claim. *See Doe v. Hamilton Coll.*, No. 21-CV-436, 2023 WL 8782020, at *24 (N.D.N.Y. Dec. 19, 2023) ("A plaintiff's feelings and perceptions of being discriminated against are not evidence of discrimination." (alteration adopted) (quoting *Brodt*, 4 F. Supp. 3d at 568).

Furthermore, even taking into account Plaintiff's now pro se status and construing the allegations in Plaintiff's SAC with the utmost leniency, *see Sykes*, 723 F.3d at 403, the Court still finds that Plaintiff does not provide any allegations that plausibly state a discrimination claim. *See Zhang v. Centene Mgmt. Co., LLC*, No. 21-CV-5313, 2023 WL 2969309, at *8 (E.D.N.Y. Feb. 2, 2023) (noting that "[c]onclusory statements of discriminatory animus unsupported by factual allegations that give rise to an inference of discriminatory intent have been found insufficient to sustain a plaintiff's minimal burden"); *see also Martin v. N.Y.S. Dep't of Mental Hygiene*, 588 F.2d 371, 372 (2d Cir. 1978) ("[A] complaint consisting of nothing more than naked assertions [that plaintiff was denied the prerequisites of his position because of his race] . .

. fails to state a claim under Rule 12(b)(6)); *McFadden v. State Univ. of N.Y., Coll. at Brockport*, 195 F. Supp. 2d 436, 448 (W.D.N.Y. 2002) (holding that plaintiff failed to show that adverse action was based on sex discrimination because conclusory allegations that gender discrimination was widespread within her department were not supported by facts, and when there was factual basis, there was no connection between facts and critical decisions, or decisionmakers involved in present case); *Rose v. Goldman, Sachs & Co.*, 163 F. Supp. 2d 238, 242 (S.D.N.Y. 2001) ("[C]onclusory allegations . . . are insufficient to raise an inference of discrimination.").

Accordingly, because Plaintiff had failed to cure the defects in his race and sex discrimination claims, the Court dismisses these claims for the same reasons it did so in its previous Opinion. *See Williams*, 2022 WL 4485298 at *10–14.[9]

2. Retaliation Under Title VII and the NYSHRL

In its previous Opinion, the Court also dismissed Plaintiff's retaliation claims. The Court determined that Plaintiff had only plausibly alleged one instance of protected activity, namely that he made an informal, verbal complaint to Yoakum regarding Plaintiff's incident with Steger. *See id.* at *16. With regard to the rest of Plaintiff's allegations, the Court determined that Plaintiff statements lacked specificity to constitute protected activity. *See id.* at *15–17. Furthermore, as to the single protected activity Plaintiff adequately alleged, the Court determined that Plaintiff failed to plausibly plead a causal connection. *See id.* at *17. In other words, the

[9] The Parties both argue as to whether Plaintiff timely filed and exhausted his administrative remedies with regard to his Title VII claims and whether William timely served a notice of claim as to his NYSHRL discrimination claims. (*See* Defs.' Mem. 11–13; Pl.'s Opp. 6–12; Defs.' Reply Mem. 3–5.) However, because the Court finds that Plaintiff's Title VII and NYSHRL claims are lacking on the merits, the Court need not discuss, let alone resolve, these arguments.

Plaintiff did not provide any facts to suggest that Plaintiff was fired because he complained to Yoakum, and therefore, Plaintiff failed to allege a connection between the protected activity and his adverse employment action. *See id.*

a. Protected Activity

As explained in its prior Opinion, "the Second Circuit has held that 'protected activities' include 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.'" *Id.* at *15 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000), *superseded on other grounds by* N.Y.C. Local L. No. 85). "[A] complaint regarding 'unprofessional conduct' that do[es] not sound in discrimination is not considered a protected activity." *Id.* (quoting *Roman-Malone v. City of New York*, No. 11-CV-8560, 2013 WL 3835117, at *8 (S.D.N.Y. July 25, 2013) (dismissing retaliation claims where the complaints concerned non-discriminatory misconduct, as "[s]uch 'unprofessional conduct' is not statutorily prohibited")); *see also Gonzalez v. NYU Langone Med. Ctr.*, No. 18-CV-1797, 2019 WL 4194313, at *5 (S.D.N.Y. Sept. 3, 2019) (collecting cases) ("[M]ere complaints of unfair treatment without reference to any protected characteristic are insufficient to state a Title VII retaliation claim."). The question, then, is whether Plaintiff's complaints contained a good-faith, objective, reasonable belief that employment law was being violated.

In its previous Opinion, the Court considered six different events that could potentially constitute forms of protected activity. The events included: (1) Plaintiff made an informal, verbal complaint to an on-duty nurse about the October 14, 2019 incident the day it occurred, which Steger interrupted; (2) Plaintiff made an informal, verbal complaint to Yoakum regarding the incident; (3) Plaintiff filed a formal complaint with Human Resources regarding the incident

"two days later"; (4) Plaintiff "filed another complaint around October 23, 2019" after Plaintiff was scheduled to work with Steger again; (5) Plaintiff made an informal, verbal complaint in the form of a conversation with an unnamed manager who essentially stated his complaint would not alter the status quo "because it was a female world"; and (6) Human Resources refused to respond to emails regarding the misconduct or to speak with him directly. *Williams*, 2022 WL 4485298 at *15. Of these events the Court concluded that Plaintiff's complaint to Yoakum constituted protected activity. With regard to the other events, the Court determined that Plaintiff failed to provide sufficiently specific allegations for the Court to find that they were examples of protected activity. *Id.* at *15–17.

The Court evaluates Plaintiff's SAC to determine whether Plaintiff has provided additional allegations for the Court to find further instances in which Plaintiff engaged in protected activity. In doing so, the Court notes, as it did in its previous Opinion, that "[f]or a complaint to constitute a protected activity, 'a plaintiff must make the complaint in sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race, gender, or national origin.'" *Id.* at *16 (alterations adopted) (quoting *Harris v. Off. of New York State Comptroller*, No. 20-CV-8827, 2022 WL 814289, at *17 (S.D.N.Y. Mar. 17, 2022). "In other words, 'ambiguous complaints that do not make the employer aware of alleged *discriminatory* misconduct do not constitute protected activity.'" *Id.* (emphasis in original) (quoting *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007)).

In reviewing Plaintiff's SAC, the Court notes that while Plaintiff does provide additional allegations with regard to his complaints to HR, he still fails to plead that such complaints were examples of protected activity. For example, Plaintiff alleges that he "provided a comprehensive

play by play to assist the [HR] department in investigating the situation and act according to their findings, including providing a witness list and suggestions on which cameras would be most helpful to aid the [HR] department in their investigation."  (SAC ¶ 49.)  In addition, Plaintiff attached to his SAC, the email Plaintiff sent two days after the incident.  (*See* SAC Ex. B.)

As an initial matter, it is worth noting that the email does not reflect that it was sent to HR.  (*See id.*)  Rather, it seems that Plaintiff sent the email to various individuals at WCHCC, none of whom is identified as affiliated with HR.  (*See id.*)  In any event, assuming Plaintiff sent this email to HR, neither the email nor Plaintiff's additional allegations demonstrate that Plaintiff engaged in protected activity because neither indicate that Plaintiff complained about unfair treatment due to Plaintiff's membership in a protected class.  While the Court acknowledges that "there are no magic words that must be used when complaining," *Ramos v. City of New York*, No. 96-CV-3787, 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997), it is nonetheless true that "[t]he onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally," *Aspilaire v. Wyeth Pharmaceuticals, Inc.*, 612 F. Supp. 2d 289, 308–09 (S.D.N.Y. 2009) (citation omitted).  Absent such allegations, the Court cannot conclude that Plaintiff's HR complaint is a protected activity.  *See Harris*, 2022 WL 814289, at *17 (dismissing a claim of retaliation where the plaintiff "failed to allege that he engaged in protected activity" because he "does not allege that he ever explicitly raised the issue of gender discrimination when he complained"); *Ramirez v. Temin & Co., Inc.*, No. 20-CV-6258, 2021 WL 4392303, at *15 (S.D.N.Y. Sept. 24, 2021) (dismissing retaliation claims where the plaintiff failed to allege discriminatory treatment with respect to her complaint to management because the complaint alleged was "not sufficiently specific to constitute a protected activity"); *Cardwell*

*v. Davis Polk & Wardwell LLP*, No. 19-CV-10256, 2021 WL 4434935, at *30 (S.D.N.Y. Sept. 23, 2021) (finding, on a motion to dismiss, an alleged informal complaint made via email to be "an ambiguous complaint that does not qualify as protected activity because it was not sufficiently pointed to put any [d]efendant on notice that [the] [plaintiff] was complaining about discrimination under federal, state, or city law")).  In other words, as with his FAC, Plaintiff does not allege any facts to show that his formal complaint made "the employer aware of alleged *discriminatory* misconduct."  *Williams*, 2022 WL 4485298, at *16 (emphasis in original) (quoting *Int'l Healthcare*, 470 F. Supp. 2d at 357).

For the same reason, Plaintiff's subsequent email to HR, which Plaintiff also attaches to the SAC, (*see* SAC Ex. C), does not constitute protected activity.  The email references "unwanted conduct" that Plaintiff was subjected to and states that such conduct "has created a hostile, oppressive and intimidating working environment."  (*Id.*)  However, nowhere in the email does Plaintiff specifically express that such conduct occurred with discriminatory intent or was in any way related to discrimination.  (*See id.*)  As such, the email cannot be considered protected activity.  *See id.*

As for the remaining incidents, Plaintiff fails to provide materially different or supplementary allegations that would allow this court to reach a different result then it did in its prior Opinion.  *Brown*, 2017 WL 1040416, at *2 (dismissing plaintiff's claims because "[t]he [c]ourt . . . reviewed the amended complaint and [found] that plaintiff's claim suffer[ed] from the same infirmities as the original pleading").  For example, with regard to both his informal complaint to the on-duty nurse about the October 14, 2019 incident, (*Id.* ¶ 39), and his informal conversation with Osorio about his complaint to HR about Steger, (*Id.* ¶ 59), Plaintiff's allegations in the SAC, like in the FAC, amount only to "complaint[s] regarding 'unprofessional

conduct' that do not sound in discrimination." *Williams*, 2022 WL 4485298, at *15 (citing *Roman-Malone*, 2013 WL 3835117, at *8 (dismissing retaliation claims where the complaints concerned non-discriminatory misconduct, as "[s]uch 'unprofessional conduct' is not statutorily prohibited"); *see also Gonzalez*, 2019 WL 4194313, at *5 (collecting cases) ("[M]ere complaints of unfair treatment without reference to any protected characteristic are insufficient to state a Title VII retaliation claim.")). Accordingly, the Court concludes that these complaints do not constitute protected activity for the same reasons it did in its previous opinion. *See Williams*, 2022 WL 4485298, at *17.

Therefore, as it found previously, the Court determines that Plaintiff engaged in only one act of protected activity sufficient to establish his retaliation claims: his conversation with Yoakum on the day of the incident.[10]

b. Causal Connection

Turning to the issue of causal connection, as the Court stated in its previous Opinion, "[a] causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by

[10] In his Opposition, Plaintiff claims that he engaged in two additional forms of protected activity, including an attempt (1) to apply for FMLA leave, and (2) to obtain employment verification from WCHCC to help assist with his no-fault insurance claim. (*See* Pl.'s Opp. at 32–33.) However, as Defendants note, Plaintiff does not plead how such conduct constitutes a complaint about discrimination, and therefore, is a form of protected activity. *See Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 367 (S.D.N.Y. 2016) ("An employee engages in a protected activity when he complains of an employment practice that he reasonably believes violates the law."). Without such allegations, the Court holds that Plaintiff fails to plausibly allege protected activity in connection with these actions.

the defendant." *Williams*, 2022 WL 4485298, at *17 (internal quotation marks omitted) (quoting *Littlejohn*, 795 F.3d at 319).

Previously, the Court found that Plaintiff failed to allege a causal connection under either theory. Here, a review of Plaintiff's SAC demonstrates that Plaintiff does not provide any materially different or additional allegations to change that conclusion. As with the FAC, Plaintiff does not plead any facts to suggest that he was fired because he complained to Yoakum. In fact, as with his previous pleadings, Plaintiff alleges no direct or indirect connection between this informal complaint and his adverse employment action. *See id.* Therefore, the Court's analysis in its prior Opinion applies with equal force here. *See Perkins v. Perez*, No. 17-CV-1341, 2020 WL 248686, at *4–5 (S.D.N.Y. Jan. 16, 2020) (applying the law-of-the-case doctrine to dismiss portions of a pro se complaint where the two pleadings at issue were "substantially identical"); *Mateo v. Dawn*, No. 14-CV-2620, 2016 WL 5478431, at *4 (S.D.N.Y. Sept. 28, 2016) (same); *Guttilla v. City of New York*, No. 14-CV-156, 2016 WL 1255737, at *3 (S.D.N.Y. Mar. 29, 2016) (same).

Moreover, Plaintiff also fails, as he did with in the FAC, to allege a causal connection between his lone protected activity and his termination via indirect or circumstantial facts, namely the temporal proximity between the protected activity and the adverse employment event, because Plaintiff does not allege any facts to change the Court's previous temporal analysis as to this claim. *See id.* Specifically, the SAC reflects that Plaintiff's alleged protected activity, complaining to Yoakum about the incident with Steger, occurred on October 14, 2019, (*see* SAC ¶ 33–43; *see also* Pl.'s Opp. at 31 (stating that he complained to Yoakum on October 14, 2019)), and the alleged adverse action, Plaintiff's termination, occurred on February 12, 2020, (*see* SAC ¶ 122). This indicates that there was approximately a four-month period

between the protected activity and Plaintiff's termination, which is the amount of time the Court took into account in its previous Opinion in deciding that Plaintiff failed to allege a causal connection by indirect or circumstantial facts. *See Williams*, 2022 WL 4485298, at *18 ("[I]t remains the case that 'a greater than three-month gap, *unsupported by any other allegations showing plausible retaliation*, is insufficient to raise an inference of retaliation' and thereby defeat a Rule 12(b)(6) motion to dismiss." (alterations adopted) (emphasis in original) (quoting *McDowell v. N. Shore-Long Island Jewish Health Sys.*, 788 F. Supp. 2d 78, 82 (E.D.N.Y. 2011))).[11]

Accordingly, because Plaintiff has not cured its pleadings to plausibly allege either direct or indirect causality between Plaintiff's protected activity and the adverse employment action, the Court concludes that Plaintiff has failed to establish the necessary elements of a retaliation claim, and therefore dismisses the retaliation claims for the same reasons in its prior Opinion. *See id.* at *14–19.

3. FMLA Interference Claim

In its prior Opinion, the Court also dismissed Plaintiff's FMLA interference claim, holding that Plaintiff failed to plausibly allege that he was entitled to FMLA leave. *Id.* at *20.

[11] Plaintiff attempts to circumvent the issue of temporal proximity by arguing in his Opposition that he was subject to "a continuing course of conduct." (Pl.'s Opp. at 30.) Although Plaintiff does not elucidate his argument, the Court takes this to mean that Plaintiff is arguing that he engaged in protected activity much closer in time to the alleged adverse action. However, such an argument does not hold water, particularly where the Court has already determined that, contrary to a continuous course of conduct, Plaintiff only alleged a single instance of protected activity, namely his complaint to Yoakum, s*ee* Supra Section II.B.2.a, which occurred approximately four months prior to his termination. (*See* Pl.'s Opp. at 31 (stating that he complained to Yoakum on October 14, 2019, on the date of the incident); *id.* at 10 (noting that Plaintiff was terminated on February 12, 2020).)

"To establish an interference claim pursuant to 29 U.S.C. § 2615(a)(1), a plaintiff need only prove that an 'employer in some manner impeded the employee's exercise of his or her rights' protected . . . by the FMLA." *Crosby v. Stew Leonard's Yonkers LLC*, — F. Supp. 3d —, 2023 WL 6318524, at *15 (S.D.N.Y. Sept. 28, 2023) (alteration adopted) (quoting *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 176 (2d Cir. 2006)). As explained in its previous Opinion, "[t]o [demonstrate] a claim of FMLA interference, a plaintiff must establish that: (1) 'he is an eligible employee under the FMLA'; (2) the defendant is 'an employer as defined by the FMLA'; (3) the plaintiff 'was entitled to take leave under the FMLA[';] (4) the plaintiff gave the employer notice of his or her intention to take leave; and (5) the plaintiff 'was denied benefits to which he was entitled under the FMLA.'" *Williams*, 2022 WL 4485298, at *19 (alterations adopted) (quoting *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016)); *see also Patel v. NYU Langone Hosps.*, No. 20-112, 2021 WL 4852426, at *3 (2d Cir. Oct. 19, 2021) (summary order) (applying the same five-factor test); *Boncoeur v. Haverstraw-Stony Point Cent. Sch. Dist.*, No. 20-CV-10923, 2022 WL 845770, at *12 (S.D.N.Y. Mar. 22, 2022) (same).

In reviewing Plaintiff's SAC, the Court determines that although Plaintiff may have adequately alleged that he gave his employer notice of his intention to take leave and that his employer interfered with his ability to do so, the Court agrees with Defendants that Plaintiff has once again failed to adequately plead that he was entitled to take leave under the FMLA. (Defs.' Mem. 23–24.) *See Graziadio*, 817 F.3d at 424.[12]

[12] Defendants seem to concede the first two elements of this claim, as they do not contest them in either their opening or reply brief. (*See* Defs.' Mem.; Defs.' Reply Mem.) Accordingly, the Court accepts that Plaintiff is an eligible employee and that WCHCC is an employer under the FMLA.

As explained in this Court's prior Opinion, "[a]n eligible employee is entitled to FMLA leave, inter alia, 'because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'"  *Williams*, 2022 WL 4485298, at *20 (alteration adopted) (quoting 29 U.S.C. § 2612(a)(1)(D)).  "The FMLA further defines a 'serious health condition' as an injury that requires 'inpatient care in a hospital, hospice, or residential care facility' or 'continuing treatment by a health care provider.'"  *Id.* (quoting 29 U.S.C. § 2611(11)).  "Courts in this district have relied on Department of Labor ["DOL"] regulations to determine whether a plaintiff's injury satisfies the FMLA's definition of a 'serious health condition.'"  *Id.* (quoting *Banks v. McGlynn, Hays & Co.*, No. 21-CV-679, 2022 WL 845752, at *2 (S.D.N.Y. Mar. 22, 2022)).  "Under DOL regulations, there are several independent bases that can satisfy this definition."  *Id.*  The following two are relevant in this Action:

> (a) Incapacity and treatment. A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> > (1) Treatment two or more times, within [thirty] days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
> >
> > (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.
> >
> > (3) The requirement in paragraphs (a)(1) and (2) of this section for treatment by a health care provider means an in-person visit to a health care provider. The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity.
> >
> > (4) Whether additional treatment visits or a regimen of continuing treatment is necessary within the [thirty]–day period shall be determined by the health care provider.

> (5) The term extenuating circumstances in paragraph (a)(1) of this section means circumstances beyond the employee's control that prevent the follow-up visit from occurring as planned by the health care provider. Whether a given set of circumstances are extenuating depends on the facts. For example, extenuating circumstances exist if a health care provider determines that a second in-person visit is needed within the [thirty]–day period, but the health care provider does not have any available appointments during that time period.
>
> . . .
>
> (c) Chronic conditions. Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:
>
> (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;
>
> (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
>
> (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.115(a)–(c).

In the SAC, unlike in the FAC, Plaintiff provides further allegations concerning his health condition, including his doctor's appointments, details about his conditions, and the days that he missed work. (*See* SAC ¶¶ 68–88). However, these allegations still fail to demonstrate Plaintiff's entitlement to FMLA leave. As with the statements in the FAC, Plaintiff's contentions in the SAC "do not sound in 'chronic' pain or symptomatology, nor do they exhibit the hallmarks of such afflictions." *Williams*, 2022 WL 4485298, at *20. (*See generally* SAC.) Specifically, there is no discussion in the SAC that Plaintiff's pain required "*periodic* visits (defined as at least twice a year) for treatment . . . over an extended period of time (including *recurring* episodes of a single underlying condition)." 29 C.F.R. § 825.115(c) (emphases added). Rather, the SAC speaks to a continuous incapacity under sub-section (a).

Plaintiff alleges that on December 15, 2019, he was involved in a car accident, which caused him several injuries and severe pain to his back and neck and caused him to miss work at WCHCC on December 15 due to injuries sustained during the car accident.  (SAC ¶¶ 66, 68.) Thereafter, Plaintiff asserts that in order "to recover from [his December 15, 2019 car] accident, and due to discomfort and pain," he missed worked for "a stretch of seven days between Wednesday January 29th, 2020, and Saturday February 8th, 2020."  (*Id.* ¶ 70.)  This allegation seemingly satisfies the first requirement of demonstrating a serious health condition, that Plaintiff suffer "[a] period of incapacity of more than three consecutive, full calendar days."  29 C.F.R. § 825.115(a).  However, in addition Plaintiff must contend that he received "subsequent treatment or [suffered a] period of incapacity relating to the *same condition*."  *Id.* (emphasis added).  He could do so by stating that he received "[t]reatment two or more times, within [thirty] days of the first day of incapacity," or "[t]reatment by a health care provider on at least one occasion, which result[ed] in a regimen of continuing treatment under the supervision of the health care provider."  *Id.* § 825.115(a)(1)–(2).  Plaintiff has alleged neither.  Plaintiff states that he visited CityMD Urgent Care on February 03, 2020, five days after his first day of incapacity, during which he was diagnosed with a "viral syndrome".  (SAC ¶¶ 72–73.)  Although Plaintiff does not specify the type of viral syndrome he was diagnosed with, he references illnesses, such as the "common cold," "influenza," and the "stomach flu."  (*Id.* ¶ 73.)  Plaintiff alleges that based on this diagnosis, the doctor wrote a letter to Plaintiff's employer, indicating that he should be excused from work for three days, from February 3, 2020, to February 5, 2020.  (*Id.* ¶ 74.) Plaintiff does not contend that his diagnosis or treatment were related to the injuries he suffered from his car accident, including the severe pain to his back and neck.  In particular, he offers no plausible connection between the car accident and virus-driven ailments such as a cold or a

stomach ailment.  Thereafter, Plaintiff alleges that he visited urgent care again on February 6,

2020, during which he was diagnosed with tendinitis of the forearm.  (*Id.* ¶¶ 77–78.)  Plaintiff

states that the doctor wrote a letter to Plaintiff's employer indicating that Plaintiff was seen on

February 6, 2020, and that based on his diagnoses, he would not be able to return to work until

February 8, 2020.  (*Id.* ¶ 79.)  Again, Plaintiff does not contend that his diagnosis or treatment

from the second visit to the doctor were related to the injuries he suffered from his car accident,

including the severe pain to his back and neck.  On February 18, 2020, Plaintiff asserts that he

visited his primary care doctor, who provided him a specialist referral form that stated "35 year

old male s/p MVA now with neck pain right lower leg radiating f[rom] back. R/o [disk] disease v

spasm.  Patient is referred to Montefiore. Radiology."  (*Id*. ¶¶ 81–82; id. Ex. G. at 2.)  Plaintiff

was scheduled to have X-Rays and an MRI done on April 6, 2020, but his appointment was

cancelled due to COVID restrictions beginning on March 16, 2020.  (*Id*. ¶¶ 85–86.)  Plaintiff

claims that a new appointment took almost an entire year to reschedule due to covid restrictions

but does not provide any further details regarding his medical history.  (Id. ¶ 86.)

      Based on the above allegations. Plaintiff seems to state that he received "[t]reatment two

or more times, within [thirty] days of the first day of incapacity," 29 C.F.R. § 825.115(a)(1),

however none of the treatments was related to the "*same condition*," *id.* § 825.115(a).  One of his

doctor's appointments was related to a viral syndrome, one to tendinitis in the forearm, and the

other to pain in his neck, leg, and back.  (*See* SAC ¶¶ 72–73, 77–78, 81–82.)  Nor does Plaintiff

assert that any of his doctor's visits led to "a regimen of continuing treatment under the

supervision of the health care provider."  29 C.F.R.  § 825.115(a)(2).  Accordingly, on this

record, and even liberally construing his allegations, the Court cannot conclude that Plaintiff has

plausibly alleged that he suffered from "a serious condition" that entitled him to FMLA leave.

Therefore, because Plaintiff fails to satisfy this requisite element, the Court dismisses Plaintiff's FMLA interference claim.

III. Conclusion

For the reasons stated above, Defendants' Motion to Dismiss is granted as to all of Plaintiff's claims. However, in light of Plaintiff's *now* pro se status, Plaintiff's claims are dismissed without prejudice. *Brunson v. Duffy*, 14 F. Supp. 3d 287, 295 (S.D.N.Y. 2014) ("Because a pro se plaintiff should be allowed to amend his complaint in response to a motion to dismiss, the dismissal is without prejudice." (quoting *Morrissette v. Cripps*, No. 10–CV–8795, 2011 WL 4089960, at *4 (S.D.N.Y. Sept. 14, 2011))). If Plaintiff wishes to file an amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiff must do so within thirty days of the date of this Order. The Amended Complaint will replace, not supplement, the SAC. The failure to timely file an Amended Complaint may result in the dismissal of this Action with prejudice.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 64).

SO ORDERED.

DATED: March 7, 2024
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE